UNITED STATES of America, Appellee,

v.

Leona M. HELMSLEY, Joseph V. Licari and Frank J. Turco, Defendants,

Leona M. Helmsley, Defendant–Appellant.

No. 42, Docket 90–1012.

United States Court of Appeals, Second Circuit.

Argued Oct. 16, 1990.

Decided July 30, 1991.

Alan M. Dershowitz, Cambridge, Mass. (Nathan Z. Dershowitz, Victoria B. Eiger, Dershowitz & Eiger, New York City, Susan Estrich, Sandor Frankel, James J. Daw, Bender & Frankel, Harvey A. Silverglate, Andrew Good, David J. Fine, Silverglate, Gertner, Fine & Good, Boston, Mass., Eric Lieberman, Terry Gross, Elizabeth St. Clair, Rabinowitz, Boudin, Standard, Krensky & Lieberman, Jane Simkin Smith, Daniel R. Williams, Kathleen Sullivan, Cambridge, Mass., Philip G. Cormier, Thomas C. Viles, Sharon Beckman, of counsel), for defendant-appellant.

Cathy Seibel, Asst. U.S. Atty., New York City (Roger S. Hayes, Acting U.S. Atty., S.D.N.Y., Kerri Martin Bartlett, Asst. U.S. Atty., James R. DeVita, Sp. Asst. U.S. Atty., New York City, of counsel), for appellee.

Before OAKES, Chief Judge, and PIERCE and WINTER, Circuit Judges.

WINTER, Circuit Judge:

A jury convicted Leona M. Helmsley of one count of conspiracy, three counts of tax evasion, three counts of filing false personal tax returns, sixteen counts of assisting in the filing of false corporate and partnership tax returns, and ten counts of mail fraud. The convictions concerned a scheme to charge personal expenditures to various business enterprises that she and

her husband owned or controlled. She was sentenced to four years in prison to be followed by three years of probation, fined over $7 million and ordered to pay restitution of nearly $2 million.

The evidence demonstrating that Mrs. Helmsley, with her husband, charged personal expenditures to businesses through deceptive billings and tax returns was overwhelming, and no sufficiency claim is raised in that regard. Nevertheless, Mrs. Helmsley challenges her convictions and sentence on numerous other grounds. First, she argues that her convictions were obtained in violation of her right against self-incrimination because the prosecution resulted from immunized testimony she had previously given to a state grand jury. Next, she contends that, because evidence of overpayment of taxes offset the government's proof of a tax deficiency, her convictions for tax evasion must be reversed. Mrs. Helmsley also claims that several of her convictions were for crimes not alleged in the indictment, that the mail fraud convictions were invalid, and that prosecutorial misconduct deprived her of a fair trial. Finally, she contests the legality of various aspects of her sentence.

We affirm her convictions. However, her convictions on three counts of filing false personal tax returns and one count of aiding in the filing of a false partnership return must, as lesser-included offenses, be merged with her convictions for tax evasion. We therefore remand to the district court for resentencing on those counts.

## BACKGROUND

Throughout the 1980's, Harry B. Helmsley and his wife, Leona M. Helmsley, presided over a network of real estate, hotel and insurance businesses. Based principally in New York City but with operations as far away as Florida and Ohio, these businesses were organized as a series of holding companies, subsidiary corporations, and partnerships directly or indirectly owned and controlled by Mr. and Mrs. Helmsley.

The centerpiece of the organization was a holding company called Helmsley Enterprises, Inc. ("HEI") of which Mr. Helmsley was President and sole shareholder. HEI operated a number of wholly owned subsidiary corporations. Helmsley–Spear, Inc. ("Helmsley–Spear") engaged in real estate and insurance brokerage businesses and acted as managing agent for various commercial office buildings and residential apartment properties in New York City and elsewhere. Many of these properties were owned or leased by other entities in the Helmsley organization. Helmsley Hotels, Inc. ("Helmsley Hotels"), of which Mrs. Helmsley was President, operated several hotels in New York City. Helmsley Hotels also held an interest, usually controlling, in a number of separate partnerships that in turn owned individual hotel, apartment and office properties. These included 230 Park Avenue Associates,[1] 166 East 61st Street Associates, Windsor Park Apartments Associates, and Graybar Building Company. Harley Hotels, Inc. ("Harley Hotels"), of which Mrs. Helmsley was also President, was a wholly owned HEI subsidiary based in Cleveland, Ohio that operated hotels and motels outside New York City. DECO Purchasing and Distributing Co., Inc. ("DECO"), another HEI subsidiary, was headquartered in Florida and acted as a centralized purchasing agent for the entire network of Helmsley businesses. Finally, HEI owned seventy-eight percent of the common stock of Realesco Equities Corp. ("Realesco"), which in turn operated a number of wholly owned subsidiaries engaged in New York City hotel and real estate brokerage businesses. The balance of Realesco's stock was held by outside investors.

In addition, Mr. Helmsley held partnership interests in a number of other businesses. These included Middletowne Associates and Garden Bay Manor Associates.[2] Mrs. Helmsley held the balance of the partnership interest in Middletowne Associates,

---

1. Mr. Helmsley also was a partner in 230 Park Avenue Associates.

2. Mr. Helmsley transferred his interest in Garden Bay Manor Associates to Helmsley Hotels on or about October 1, 1985.

while a wholly owned subsidiary of HEI held the balance in Garden Bay Manor Associates.

In June 1983, Mr. and Mrs. Helmsley purchased a twenty-one room mansion known as "Dunnellen Hall" located on approximately twenty-six acres in Greenwich, Connecticut. Soon thereafter, the Helmsleys undertook a major renovation and decoration of Dunnellen Hall. The aspects of the project pertinent to this action included a $2 million addition that enclosed one of two swimming pools and featured a rooftop marble dance floor, four jade art pieces costing $500,000, and an indoor/outdoor stereo system worth over $100,000. The Helmsleys also did extensive gardening and landscaping work at Dunnellen Hall.

Beginning at the end of 1983 and continuing for two more years, the Helmsleys schemed to charge personal expenses associated with Dunnellen Hall and elsewhere to various Helmsley business entities. With the collaboration of Joseph V. Licari, Senior Vice President and Chief Financial Officer of HEI, and Frank J. Turco, Vice President and Chief of Financial Services for Helmsley Hotels, the Helmsleys arranged for hundreds of thousands of dollars of their personal expenses to be paid by companies they directly or indirectly owned and controlled and to be carried on the books of those companies as business expenditures. In this manner, Mr. and Mrs. Helmsley were able to reap two illegal tax benefits. First, by having the companies pay the expenses rather than distribute taxable income to the Helmsleys, the Helmsleys avoided personal income taxes. Second, because the various Helmsley companies involved treated the payment of these personal expenses as business expenditures, the companies enjoyed artificially inflated business expense deductions. The tax returns filed by the Helmsleys and by the various firms reflected the false billing.

At the Helmsleys' behest, Licari and Turco carried out the scheme through the preparation of phony invoices that characterized items for Dunnellen Hall as business-related goods and services. Turco kept careful records of the expense diversions and provided Mrs. Helmsley with monthly summaries of them.

Initially, DECO served as the major purchasing vehicle for the Helmsleys' personal expenses, including lamps, furniture, carpeting and fabric. After DECO's outside accountants discovered irregularities, however, DECO became a conduit, making the purchases itself, but then billing other Helmsley-controlled businesses for reimbursement. Many of the expenses resulting from the Dunnellen Hall addition, the jade art pieces, and the stereo system were thus charged to the other Helmsley businesses. The construction of the addition was financed in part through invoices describing the work as done at various Helmsley Hotel properties. Each of the four jade pieces was purportedly purchased for a different Helmsley hotel, using invoices characterizing the pieces as antique furniture. Part of the cost of the stereo system was charged to the Helmsley Building, 230 Park Avenue in New York City, using phony invoices describing the installation of an electronic security system at that site. In addition, Helmsley–Spear, Helmsley Hotels, Harley Hotels, and subsidiaries of Realesco all were charged with personal purchases.

Meanwhile, a series of events that would bring the Helmsleys' misdeeds to the attention of the government had begun. A *New York Post* reporter, Ransdell Pierson, had at one time pursued a tip about the misuse of corporate funds by the Helmsleys but had abandoned the quest after finding little hard evidence. However, an investigation into a sales tax avoidance scheme by two jewelers had caused Mrs. Helmsley to make two appearances before state grand juries during which she gave immunized testimony. Some time later, a *New York Times* article implicated Mrs. Helmsley in the state sales tax avoidance scheme. Pierson's interest was renewed by the *Times* story, and, tipped by a disgruntled former Helmsley employee named Jeremiah McCarthy, Pierson published an article in the *Post* on December 2, 1986, stating that the Helmsleys had used false invoices to pay personal expenses with corporate

funds. This article triggered investigations by both the United States Attorney for the Southern District of New York and the New York State Attorney General. Their investigations, later combined, resulted in the federal indictment that is the genesis of the instant case and in a separate state indictment, since withdrawn.

The federal indictment contained forty-seven counts against Mr. and Mrs. Helmsley, Licari and Turco. Count 1 alleged that the four defendants conspired in violation of 18 U.S.C. § 371 to commit offenses against the United States in the form of tax and mail fraud crimes and to defraud the Internal Revenue Service. Counts 2–4 charged that Mr. and Mrs. Helmsley attempted to evade personal income tax in the calendar years 1983, 1984 and 1985 in violation of 26 U.S.C. § 7201 by failing to report on their joint personal federal income tax returns the income represented by the payment of personal expenditures by Helmsley businesses. Counts 5–7 alleged that Licari and Turco violated 26 U.S.C. § 7201 and 18 U.S.C. § 2 by aiding and abetting the Helmsleys' personal income tax evasion. Counts 8–10 charged Mr. and Mrs. Helmsley with filing fraudulent federal personal tax returns in 1983, 1984 and 1985 in violation of 26 U.S.C. § 7206(1). Counts 11–13 charged Licari and Turco with aiding and abetting the fraudulent filings, this time in violation of 26 U.S.C. § 7206(2).

Counts 14–29 charged all four defendants with assisting in the filing of fraudulent federal corporate and partnership income tax returns for various Helmsley-controlled business entities in violation of 26 U.S.C. § 7206(2). Each count alleged a separate instance of a phony deduction claimed in the period 1983–1985. Counts 30–39 charged all defendants with mail fraud in violation of 18 U.S.C. § 1341 by using the mails to file false personal New York State income tax returns and false New York State Corporation Franchise Tax Reports. Counts 40–46 also charged mail fraud, alleging that all four defendants had defrauded the minority shareholders of Realesco by mailing financial statements that characterized the payment of personal

expenses for Mr. and Mrs. Helmsley as business-related expenditures. Finally, Count 47 charged Mrs. Helmsley and Turco with conspiracy to commit extortion in violation of 18 U.S.C. § 1951 by demanding kickbacks from various contractors and vendors that did business with the Helmsley companies.

Before trial, Judge Walker found that poor health rendered Mr. Helmsley incompetent to stand trial. *See United States v. Helmsley*, 733 F.Supp. 600 (S.D.N.Y.1989). On August 30, 1989, after a ten-week trial, the jury returned guilty verdicts against the remaining defendants on thirty-nine counts. Mrs. Helmsley was found guilty on Counts 1, 2–4, 8–10, 14–29, and 30–39. Licari and Turco each were found guilty on Counts 1, 5–7, 11–13, 14–29, and 30–39. All defendants were acquitted on Counts 40–46, the alleged Realesco fraud, and Mrs. Helmsley and Turco were acquitted on Count 47, the alleged extortion of kickbacks.

On December 12, 1989, Judge Walker sentenced Mrs. Helmsley to four years' imprisonment followed by three years' probation and 250 hours of community service. Additionally, he imposed fines totalling $7,152,000 and mandatory special assessments totalling $1,350, directed Mrs. Helmsley to pay the entire cost of her prosecution, and ordered her to pay restitution for taxes owed to the United States in the amount of $1,221,900 and to New York State in the amount of $469,300, plus interest.

Judge Walker sentenced Licari to thirty months' imprisonment, three years' probation, a $75,000 fine and $1,350 in mandatory special assessments. Turco received two years in prison, three years' probation, a $50,000 fine, and $1,350 in mandatory special assessments. Licari and Turco did not appeal their convictions.

On appeal, Mrs. Helmsley argues that all her convictions must be reversed because they were obtained in violation of her Fifth Amendment right against self-incrimination. In addition, she argues that her convictions on Counts 2–4 must be reversed

for insufficiency of the evidence, or alternatively, vacated and remanded for a new trial because of erroneous jury instructions. Mrs. Helmsley further contends that her convictions on Counts 1, 8–10, and 14–29 must be vacated and remanded for a new trial because they were based on conduct not charged in the indictment. She also claims that her mail fraud convictions are invalid and that prosecutorial misconduct requires a new trial on all counts. Finally, Mrs. Helmsley challenges various aspects of her sentence.

## DISCUSSION

### A. The Self–Incrimination Claim

Mrs. Helmsley claims that her investigation, prosecution and convictions were based on the unconstitutional use of immunized testimony that she had previously provided to a New York State grand jury. As noted above, reports of, or based on, this testimony aroused Pierson's suspicions and led to his article that triggered the federal-state investigation and resulted in her indictment and convictions. She claims that the causal link between her prior testimony and subsequent convictions violates her Fifth Amendment right against self-incrimination. She asks that the convictions against her be reversed, or that the case be remanded for an evidentiary hearing as to whether the evidence against her was sufficiently independent of her prior immunized testimony to pass constitutional muster. We conclude, however, that, even if all of the potentially disputed facts are resolved in Mrs. Helmsley's favor, her right against self-incrimination was not violated.

Her claim arises as follows. On June 11, and November 7, 1985, Mrs. Helmsley was compelled to testify before New York State grand juries investigating sales tax fraud by two New York jewelers, Bulgari and Van Cleef & Arpels. By testifying, she received an automatic statutory grant of transactional immunity. See N.Y.Crim. Proc.Law §§ 190.40, 50.10–.30 (McKinney 1981 & 1982). Mrs. Helmsley's testimony concerned her alleged participation in a scheme to avoid New York State sales taxes by shipping empty boxes to out-of-state addresses that she provided.

On November 6, 1986, the New York Times published a story that "Leona Helmsley ·... failed to pay sales taxes in New York on hundreds of thousands of dollars of jewelry she purchased over several years from Van Cleef & Arpels." The story identified its sources as "court documents" filed by two senior officers of Van Cleef & Arpels who were facing state charges that they helped customers avoid taxes, and "law-enforcement officials" who apparently confirmed that Mrs. Helmsley had purchased $485,000 worth of jewelry without paying the required tax. Similar stories by the New York Post and United Press International indicated that Mrs. Helmsley's name had surfaced in filings made by the Manhattan district attorney in response to the Van Cleef & Arpels defendants' motion for dismissal.

About a year before these stories appeared, Pierson, the Post reporter, had begun an investigation into possible misuse of corporate funds by the Helmsleys based on an uncorroborated tip. His research proved fruitless, however, and he discontinued the investigation a few months later. However, when he read about Mrs. Helmsley's involvement in the Van Cleef & Arpels sales tax fraud case, Pierson perceived a "morality connection" between the jewelry probe and his earlier project and reopened his investigation of the Helmsleys.

This time, Pierson amassed sufficient evidence on which to base a story. Apparently, previously uncooperative or unknown witnesses now stepped forward to give Pierson information on the Helmsleys. In particular, Jeremiah McCarthy, a former Senior Vice President of Helmsley–Spear who had been fired by Mrs. Helmsley in September 1985, appears to have been Pierson's key informant. On December 2, 1986, Pierson published an article in the Post alleging that various expenses relating to the renovation of Dunnellen Hall were billed to Helmsley-owned companies.

Assistant United States Attorney James R. DeVita, who had meanwhile commenced an investigation of Mr. Helmsley on an

unrelated tax matter, widened his probe to include the new allegations in Pierson's article. Leads turned up quickly. McCarthy provided the government with a substantial amount of information relating to the practice of charging Dunnellen Hall expenditures to Helmsley business entities. This information included names of employees familiar with the scheme and falsified invoices bearing the initials of Mr. and Mrs. Helmsley. DeVita also heard from Mark Arisohn, a lawyer who called the United States Attorney's Office to explain that he was representing the Helmsleys and their companies with respect to matters discussed in the *Post* article. Arisohn purported to have an innocent explanation of the various charges to the business entities. In January 1987, documents were produced pursuant to grand jury subpoena that included two memos from Turco that Judge Walker later termed a "virtual roadmap for further investigation of the Dunnellen Hall expenditures." *United States v. Helmsley,* 726 F.Supp. 929, 935 (S.D.N.Y.1989). They set forth on a cumulative basis the amounts expended on Dunnellen Hall, identified the specific Helmsley business entity that made each expenditure and the vendor to whom each amount was paid, stated the purpose of each payment, and revealed Mr. and Mrs. Helmsley's personal knowledge of the scheme. Armed with this information, the federal investigation was combined with a parallel inquiry by the New York attorney general's office. A federal grand jury thereafter indicted the Helmsleys.

Prior to trial, Mrs. Helmsley moved for an evidentiary hearing on her claim that the prior immunized state grand jury testimony on the jewelry matter had tainted the federal prosecution leading to the instant indictment. Judge Walker postponed the question until the completion of trial, at which time he could determine with the benefit of trial evidence whether there was a sufficient nexus between the immunized testimony and the federal prosecution to warrant a hearing. After her conviction, Mrs. Helmsley renewed her motion for a hearing.

After a limited hearing, Judge Walker determined that a full evidentiary hearing was not required. Before him were the transcripts of the two grand jury proceedings and several submissions, including an affidavit from DeVita. That affidavit stated that the income tax investigation was based on evidence independent of Mrs. Helmsley's immunized testimony or leads derived therefrom and explained DeVita's knowledge relating to the commencement and conduct of the investigation. Judge Walker also heard testimony from DeVita and from Diane Peress, a lawyer from the New York State attorney general's office who had been present during one of Mrs. Helmsley's state grand jury appearances, and had since been designated as a Special Assistant United States Attorney for the joint federal-state investigation. DeVita elaborated on his affidavit, and Peress testified that she made no use of Mrs. Helmsley's June 1985 testimony, directly or indirectly, in the subsequent joint income tax investigation. DeVita testified that he had arranged for a third member of his office, acting as a "Chinese Wall," to review Mrs. Helmsley's grand jury testimony and assure that the subject matters were sufficiently independent to remove the danger of taint by Peress's involvement. Satisfied that the government had made a credible showing that it had an independent evidentiary basis for its prosecution and that no further hearing regarding the influence of the immunized testimony on the motives of Pierson, McCarthy or other witnesses was required, Judge Walker denied Mrs. Helmsley's motion for a full evidentiary hearing. *See Helmsley,* 726 F.Supp. at 939.

On appeal, Mrs. Helmsley asserts that "[t]he Fifth Amendment imposes 'a total prohibition on use' of immunized testimony 'in any respect' in *any* subsequent prosecution of the witness." Appellant's Opening Brief at 14 (quoting *Kastigar v. United States,* 406 U.S. 441, 453, 460, 92 S.Ct. 1653, 1661, 1664, 32 L.Ed.2d 212 (1972)). Hypothesizing a direct "chain of taint" from her immunized testimony to the November 1986 newspaper stories to Pierson's *Post* article to the federal investigation to her prosecution and convictions, she con-

cludes that her prior immunized testimony was the "but for" cause of her instant convictions and hence that her right against self-incrimination has been violated.

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." In *Kastigar*, the Supreme Court stated that this prohibition against compelled testimony is not absolute and upheld the constitutionality of the federal use immunity statute, 18 U.S.C. §§ 6002–03. The petitioners had been held in contempt for refusing to testify before a federal grand jury under a grant of immunity pursuant to Sections 6002 and 6003, which authorize the government to order a witness to testify, but prohibit use of that testimony against the witness in any criminal case.[3] The Court affirmed the contempt order, finding that the statute sufficiently protected the right against self-incrimination.

> This total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an "investigatory lead," and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures.

406 U.S. at 460, 92 S.Ct. at 1664–65 (footnote omitted). Before *Kastigar*, the Court held in *Murphy v. Waterfront Commission*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), that the Fifth Amendment bars the use in a subsequent federal prosecution of compelled testimony obtained in state proceedings. It declared,

> Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have

the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence.

378 U.S. at 79 n. 18, 84 S.Ct. at 1609 n. 18.

■ Because the district court did not hold an evidentiary hearing, we accept *arguendo* Mrs. Helmsley's hypothesis that the November 1986 news stories contained information based on Mrs. Helmsley's immunized testimony; that these stories caused Pierson to renew his inquiry into the Helmsleys' income tax practices and caused previously unavailable sources of incriminating information, such as McCarthy, to emerge; that Pierson's *Post* article was the catalyst for the joint federal-state investigation; and that factual information derived from Pierson and his sources provided the basis of the subsequent prosecution and convictions of Mrs. Helmsley. Even if these assumptions are made, however, the causal links between Mrs. Helmsley's grand jury testimony and her convictions do not implicate the Fifth Amendment.

■ *Kastigar* considered only the facial validity of the federal use immunity statute and did not address the intricacies of what constitutes an impermissible use of immunized testimony. While neither a witness's immunized testimony nor information derived from that testimony may be offered as evidence against that witness in a subsequent criminal trial, courts interpreting *Kastigar* have struggled with more attenuated connections between immunized testimony and a witness's conviction. *See generally United States v. North*, 910 F.2d 843, 853–73 (*per curiam*), cert. denied, —— U.S. ——, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991).

---

**3.** The general federal use immunity provision, 18 U.S.C. § 6002 (1988), provides:

Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—

 (1) a court or grand jury of the United States,

 (2) an agency of the United States, or

 (3) either House of Congress, a joint committee of the two Houses, or a committee or a subcommittee of either House,

and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

Mrs. Helmsley argues that a cause-in-fact relationship between immunized testimony and a subsequent conviction, without more, triggers Fifth Amendment protection. That position, however, expands the right against self-incrimination far beyond any discernible policy served by the right. If a grand jury witness testifying under a grant of immunity were recognized by a grand juror as the perpetrator of a bank robbery committed the week before, an undeniable causal link between the immunized testimony and a conviction for bank robbery would exist, but a plausible Fifth Amendment argument could not be made. Similarly, if Pierson's interest as sparked by the grand jury story had caused him to scrutinize Mrs. Helmsley's future conduct and induced some of her employees to aid his ongoing investigation, she would certainly not be immune from prosecution for tax evasion occurring after the grand jury appearance although the causal connection to the immunized testimony would be as strong as in the instant matter.

█ What is lacking in Mrs. Helmsley's argument is a link between the chain of causation in her case, largely fortuitous, and policies underlying the Fifth Amendment. Under present caselaw, the Fifth Amendment prohibits the use of immunized testimony in two circumstances: (1) where the immunized testimony has some evidentiary effect in a prosecution against the witness, or (2) where there is a recognizable danger of official manipulation that may subject the immunized witness to a criminal prosecution arising out of the investigation in which the testimony is given.

The cases concerning the evidentiary effect of immunized testimony in a prosecution against the witness arise, of course, directly from *Kastigar*. They are, however, of little relevance to the present case. There was no connection between the content of the evidence against Mrs. Helmsley in the instant matter and her immunized testimony apart from the attenuated chain of events that caused the federal authorities to learn of the existence of the evidence. Her case is thus much like the case of the bank robber recognized by the grand

juror. In contrast, the most expansive reading of the Fifth Amendment to date regarding the evidentiary use of immunized testimony, *United States v. North, supra*, involved factual circumstances in which there was the possibility that the content of the testimony of the prosecution's witnesses was affected by the defendant's immunized testimony. No such claim can be made in the present case.

Mrs. Helmsley thus relies most heavily upon *United States v. Kurzer*, 534 F.2d 511 (2d Cir.1976), a case in which the danger of official manipulation of immunized testimony existed. *Kurzer* involved a joint federal-state investigation of the meat industry in New York. Harry Kurzer, an accountant for several meat companies controlled by Moe Steinman, the original target of the investigation, testified against Steinman before a federal grand jury under a grant of immunity. Steinman eventually pleaded guilty to various charges. Pursuant to a cooperation agreement, Steinman thereafter informed investigators of a meat-packing industry scheme to generate cash income using false invoices, and of Kurzer's involvement in the scheme. This information led to an indictment against Kurzer for tax fraud. We explicitly rejected the district court's conclusion that Kurzer's right against self-incrimination was violated solely because his "testimony set in motion the train of events which ultimately resulted in his own indictment." 534 F.2d at 515. However, we held that the Fifth Amendment would be violated if Kurzer's testimony caused Steinman's decision to provide evidence against Kurzer. *See id.* at 517; *see also United States v. Biaggi*, 909 F.2d 662, 689–90 (2d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991).

Mrs. Helmsley argues that *Kurzer* requires us to reverse her convictions and remand for a hearing. She posits that her state grand jury testimony, as publicized in the November 1986 news stories, may have motivated certain witnesses, McCarthy in particular, to come forward with information against her.

We do not interpret *Kurzer* so broadly, however. In *Kurzer,* the immunized testimony was given during the course of a single, integrated, official investigation that led to the revelation of crimes committed by the immunized witness. We held only that where the grant of immunity in the course of an investigation compels testimony that angers a target of the investigation and causes the target to implicate the immunized witness by testimony that would otherwise not have been given, a Fifth Amendment violation occurs. In contrast, the investigation into Mr. and Mrs. Helmsley's federal income tax practices was factually, functionally and legally separate from the state sales tax matter. Moreover, the key link in the causal chain between Mrs. Helmsley's grand jury testimony and her conviction was Pierson, a newspaper reporter who decided to reopen his earlier investigation because of his perception of a "morality connection" and who happened upon McCarthy as a result. Nothing in *Kurzer* suggests that the Fifth Amendment applies to situations in which publicity concerning immunized testimony triggers a purely private investigation into an entirely different matter solely because each matter involves dishonest conduct.

In *Kurzer,* there existed a danger of manipulation by government investigators who might immunize a witness and then use the fact of the immunized testimony to anger a subject of the investigation and cause that subject in turn to incriminate the witness. Such a danger directly implicated Fifth Amendment policies, and thus testimony that might have resulted from such manipulation could not be used against the immunized witness.

In the instant matter, the curiosity of a private party was fortuitously sparked a year after the grand jury appearances by publicity attending the sales tax prosecution of the jewelers. The matters investigated by the private party were factually and legally unrelated to the immunized testimony. Moreover, the federal investigation was initiated solely as a result of a newspaper story by the private party and before any cooperation with state authorities regarding income tax matters had begun. There was thus no evidentiary use of any kind of her immunized testimony and no serious danger of manipulative use of the fact of her testimony. The chain of events following her immunized testimony, although unlucky for her, did not, therefore, implicate Fifth Amendment policies.[4]

### B. *Tax Evasion*

Mrs. Helmsley challenges her tax evasion convictions (Counts 2–4) on the ground that the government failed to prove a tax deficiency, a necessary element of that crime.

■ In addition to showing willfulness and an affirmative act constituting an evasion, the government must prove beyond a reasonable doubt the existence of a tax deficiency to establish tax evasion under 26 U.S.C. § 7201. *See Sansone v. United States,* 380 U.S. 343, 351, 85 S.Ct. 1004, 1010, 13 L.Ed.2d 882 (1965); *Lawn v. United States,* 355 U.S. 339, 361, 78 S.Ct. 311,

---

**4.** Our decisions in *United States v. Nemes,* 555 F.2d 51 (2d Cir.1977) and *In re Corrugated Container Antitrust Litigation,* 644 F.2d 70 (2d Cir. 1981), are not to the contrary. In *Nemes,* the defendant was convicted of conspiring to submit false Medicare and Medicaid cost reports under 18 U.S.C. § 371. Previously she provided immunized testimony and documents to state officials who were investigating the same matter. We reversed the conviction and remanded for a *Kastigar* hearing because of the "possibility that someone who [had] seen the compelled testimony was thereby led to evidence that was furnished to federal investigators." 555 F.2d at 55. In *Nemes,* however, our holding was restricted to circumstances in which the state and federal investigations involved the same con-

duct, and opportunity for official manipulation existed. Indeed, we expressly noted that "[r]einstatement of the judgment of conviction will . . . occur if [defendant] fails to show that she testified before the state grand jury under immunity on matters related to the federal prosecution." *Id.* at 55 n. 5. Similarly, in *In re Corrugated Container Antitrust Litigation,* we held that where a civil litigant uses the prior immunized testimony of a witness as the source of questions to that witness, a prosecutor may not use non-compelled answers to such questions in a subsequent prosecution against the witness. Of course, the answers were in a factual sense directly derived from the immunized testimony. *See* 644 F.2d at 77.

323, 2 L.Ed.2d 321 (1958); *United States v. Koskerides*, 877 F.2d 1129, 1137 (2d Cir. 1989); *United States v. Citron*, 783 F.2d 307, 312 (2d Cir.1986). We have also required a showing that the deficiency was substantial. *See Koskerides*, 877 F.2d at 1137; *Citron*, 783 F.2d at 312. The evidence introduced by the government in its main case showed that by failing to report the value of personal goods and services charged to Helmsley-controlled businesses, the Helmsleys understated their taxable income on their joint personal federal income tax returns by $245,485 in 1983, $1,146,793 in 1984, and $1,197,454 in 1985. This resulted in income tax deficiencies of $49,770, $573,396, and $598,727, respectively.

■ In response, Mrs. Helmsley offered evidence that she and her husband actually overpaid their personal income tax in 1983, 1984 and 1985 in amounts sufficient to offset the alleged deficiencies. This evidence, which is the basis for her claim of insufficiency as a matter of law, consisted of the testimony of two accountants who stated that the Helmsleys' tax returns failed to comply with the accelerated cost recovery system ("ACRS") of the Economic Recovery Tax Act of 1981, Pub.L. No. 97–34, § 201, 95 Stat. 172, 203, in effect during the years in question. In doing so, the accountants testified, the Helmsleys had deducted too little of the cost basis associated with buildings owned by partnerships in which Mr. or Mrs. Helmsley held an interest.[5] Calculating that the overpayment in each tax year exceeded the amount of the deficiency shown by the government's evidence, the experts opined that Mrs. Helmsley had in each year paid more income tax than she owed.

Mrs. Helmsley's overpayment defense rested on the amount of depreciation allowed with respect to certain buildings owned by partnerships in which the Helmsleys had an interest. On their tax filings for 1983 through 1985, the Helmsleys had recovered the cost basis of these buildings by depreciating them on a "straight-line" basis over their 15–year useful life—6.67% per year. However, according to the accountant witnesses, ACRS mandated that the cost basis of buildings be segregated into "real" and "personal" property components and that the personal property component be depreciated over a shorter useful life of five years, at rates between 15% and 22% per year. *See* Pub.L. No. 97–34, § 201, 95 Stat. 172, 204–06.

Mrs. Helmsley's first expert witness, Robert Schweihs, appraised a sample of Helmsley partnership buildings and testified that 7.8% of their cost basis was attributable to personal property—carpeting, draperies, cabinetry and the like. The second defense expert, Gerald W. Padwe, testified that segregating real versus personal property was mandatory under ACRS and that Mrs. Helmsley had not done so on her tax filings. Padwe applied Schweihs's 7.8% figure to the cost basis of buildings owned by three Helmsley partnerships—known as the Formula Properties—to derive personal property components. He then depreciated these components over a five-year period, and calculated the effect on the Helmsleys' personal income tax returns. He testified that this adjustment gave Mrs. Helmsley additional depreciation deductions in the amounts of $519,983 for 1983, $1,000,028 for 1984, and $1,942,212 for 1985.

In addition, Padwe testified that the Helmsleys had made a second depreciation error. Although they had depreciated the real property component of the partnership buildings at a rate of 6.67% per year (because they depreciated the entire cost basis of buildings at that rate), Padwe stated that ACRS regulations required a rate of 7% for the first ten years and 6% for the remaining five years. Applying the .33% differential to the Formula Properties and buildings owned by eleven other Helmsley partnerships, Padwe testified, gave Mrs. Helmsley additional depreciation deductions in 1983 through 1985 that she had not taken. The combined effect of the unused

5. A partnership itself does not pay federal income tax; the net gain or loss from a partnership flows through to the individual partners in proportion to their ownership interest. Likewise, partnership deductions flow through to partners and reduce their taxable income. *See* 26 U.S.C. §§ 701–04 (1982).

deductions, he further testified, was that the Helmsleys overpaid their joint personal income taxes by approximately $93,000 in 1983, $21,000 in 1984, and $477,000 in 1985, even if the unreported taxable income claimed by the government existed. In other words, the defense's evidence suggested that, in each year, the tax overpayment resulting from underdepreciation of personal property—fifteen years rather than five years as explained *supra*—and real property—6.67% rather than 7%—exceeded the tax deficiency resulting from the underreporting of income.

The government then sought through cross-examination to show that Schweihs's and Padwe's conclusions were based on a selective application of the ACRS that ignored tax-increasing ramifications of depreciating personal property at a faster rate than real property. Most significantly, Padwe admitted that he had not taken into account the "recapture" provision of Internal Revenue Code Section 1245, which requires that any gain from the sale of personal property be taxed as ordinary income (as opposed to a capital gain) in the year of the sale to the extent that any depreciation was taken on the property. *See* 26 U.S.C. § 1245 (1982). Hence, while segregating personal property might afford extra depreciation in the years following purchase, it could also lead to higher taxes when sold. Padwe admitted on cross-examination that he had not calculated the effect of recapture resulting from the separation of real and personal property for depreciation purposes on the millions of dollars of capital gains from the sales of Helmsley partnership property in 1983, 1984 and 1985.

■ Mrs. Helmsley's insufficiency claim fails on two grounds. First, Padwe's testimony was at odds with applicable law, and it would not have been error to exclude it completely. Having selected a particular depreciation method—whether or not it was a method authorized under the law—Mrs. Helmsley was not free to recalculate her taxes by resorting to one of the four depreciation methods in ACRS solely to defend an evasion charge. If her original selection of a depreciation period was made

for strategic tax-saving purposes, the doctrine of election would prevent her from abandoning that choice. If her original selection was a good faith error, then an exception to that doctrine would allow her, with the permission of the Commissioner, to elect a new depreciation method. The depreciation method used by Padwe was one of four options, all of which would be available for late election in the case of a good faith mistake and at least two of which would entail a deficiency rather than overpayment. Because Padwe's method was not mandatory, therefore, it cannot be used to establish an overpayment in an evasion case. Second, even if Padwe's depreciation method was available and mandatory, his testimony was undermined by the government's cross-examination, and a reasonable trier might choose to reject it, as did the jury in the instant matter.

ACRS, since repealed, was mandatory for property "placed in service" after December 31, 1980. *See* Economic Recovery Tax Act of 1981, Pub.L. No. 97–34, § 201, 95 Stat. 172, 203–04. Within ACRS, formerly Section 168 of the Internal Revenue Code, a taxpayer did have options. That section designated real property as "15–year real property" and personal property as "5–year property." The general depreciation provision, Section 168(b)(1), the one selected by Padwe, provided that the basis of 5–year property could be recovered over five years in percentages of 15, 22, 21, 21 and 21, respectively. Section 168(b)(2) stated that 15–year real property was to be depreciated according to a schedule to be promulgated by the Secretary. However, Section 168(b)(3) allowed a taxpayer to elect one of three additional options. Five-year property could be depreciated on a straight-line basis over 5, 12 or 25 years, and 15–year real property could be depreciated on a straight-line basis over 15, 35 or 45 years.

Mrs. Helmsley argues that by not segregating her real and personal property she made no election with respect to personal property, and that therefore the ACRS provisions of Section 168(b)(1) applied by Padwe—five-year depreciation in percentages of 15, 22, 21, 21 and 21, respectively—

applied to the personal property component of her partnerships by default. It is true that Section 168(b)(3) does not provide straight-line depreciation of 5–year property over fifteen years, the option used on the Helmsleys' returns. However, Mrs. Helmsley had four depreciation options available for personal property: (1) over five years in percentages of 15, 22, 21, 21 and 21 respectively (the method used in Padwe's testimony), (2) over five years on a straight-line basis, (3) over twelve years on a straight-line basis, and (4) over twenty-five years on a straight-line basis. The fact that a fifteen-year depreciation schedule for (unsegregated real and) personal property was selected is not grounds for allowing her now to convert the depreciation of personal property to the accelerated five-year schedule of Section 168(b)(1) that Padwe used—rather than five, twelve or twenty-five years on a straight-line basis—solely to avoid a tax evasion charge for an entirely separate aspect of her tax returns. This is so whether or not Mrs. Helmsley's original selection was for strategic tax-savings reasons or was a good faith error.

Under the doctrine of election, a taxpayer who makes a conscious election may not, without the consent of the Commissioner, revoke or amend it merely because events do not unfold as planned. *See, e.g., J.E. Riley Investment Co. v. Commissioner,* 311 U.S. 55, 61 S.Ct. 95, 85 L.Ed. 36 (1940); *Pacific National Co. v. Welch,* 304 U.S. 191, 58 S.Ct. 857, 82 L.Ed. 1282 (1938). "Once the taxpayer makes an elective choice, he is stuck with it." *Roy H. Park Broadcasting, Inc. v. Commissioner,* 78 T.C. 1093, 1134 (1982).

There is ample evidence in the record—although the issue is not dispositive—to regard Mrs. Helmsley's original selection of a depreciation method as a strategically motivated, conscious decision. Padwe's testimony itself would support an inference that her failure to segregate her personal property and depreciate it over a permissible period was a calculated decision intended to obtain substantial tax benefits. As he testified, at the time of the pertinent tax returns, gains from the sale of real property were taxed as capital gains, whereas gains from the sale of personal property were taxed as ordinary income. The capital gains tax rate was approximately forty percent of the top marginal income tax rate. Padwe acknowledged that a taxpayer planning to sell personal property would not want to depreciate it because upon sale of the property he would owe income tax on the depreciated amount. Moreover, he testified that: (i) there were tax advantages to misclassifying personal property as real property; and (ii) chief among these advantages was avoiding recapture as income of depreciated amounts. In addition, Padwe admitted that Mrs. Helmsley had segregated and depreciated personal property elsewhere on her return, acts wholly at odds with an inference of inadvertence. Based on Padwe's own testimony, therefore, there is ample reason to believe that Mrs. Helmsley deliberately chose not to segregate personal property because she hoped to conceal the personal property components of her holdings, thereby reaping the benefit of real property depreciation without running the risk of subsequent recapture.

Absent the Commissioner's consent, a taxpayer who has used a particular depreciation method may not defend an evasion charge on the ground that, under an alternative method, additional depreciation could have been claimed. *See Fowler v. United States,* 352 F.2d 100 (8th Cir.1965), *cert. denied,* 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966). In *Fowler,* appellants were convicted of tax evasion and argued that the district court erred in excluding expert testimony that appellants could have taken greater depreciation on certain assets had the useful life of the assets been calculated under a different method. The Eighth Circuit disagreed, explaining that the exclusion of expert testimony was proper because appellants had "elected one method of determining depreciation and that election binds them for purposes of this action." *Id.* at 106.

The law could hardly be otherwise. If it were, evaders with complicated returns would be allowed to evade taxes on one portion of their return while using a depre-

ciation period that would be the most profitable in the long run if the evasion went undetected. If the evasion were uncovered, then they would need only to recalculate under a shorter depreciation period that would increase deductions for the years in which evasion is charged. This is precisely the defense raised by Padwe's testimony. Mrs. Helmsley seeks to distinguish *Fowler* on the sole ground that *Fowler* involved an original selection of a valid depreciation period whereas she wishes to recalculate after selecting an invalid depreciation period. Common sense dictates that, if recalculation is denied to tax cheats who have selected valid depreciation periods, it must a fortiori be denied to tax cheats like Mrs. Helmsley who further enhanced tax benefits by selecting impermissible periods.

In any event, Mrs. Helmsley's failure to segregate personal property was equivalent in scope and effect to the selection of an accounting method for personal property, and it is axiomatic that a taxpayer may not change accounting methods without first obtaining the Commissioner's consent. *See* 26 U.S.C. § 446(e) (1988); Treas.Reg. § 1.446–1(e)(2)(ii)(a) (1957) (defining accounting method change as "a change in the treatment of any material item"). *See also Witte v. Commissioner*, 513 F.2d 391 (D.C.Cir.1975); *Standard Oil Co. (Indiana) v. Commissioner*, 77 T.C. 349 (1981). Moreover, Treasury Regulation Section 1.167(e)–1(a) requires that "[a]ny change in the method of computing the depreciation allowances with respect to a particular account ... is a change in method of accounting, and such a change will be permitted only with the consent of the Commissioner." Treas.Reg. § 1.167(e)–1(a) (as amended in 1972). This rule applies whether or not the original accounting method was permissible. *See Witte*, 513 F.2d at 394 (consent requirement applies "regardless of whether the change in method is from one proper method to another or from an improper method to a proper one"); *United States v. Kleifgen*, 557 F.2d 1293, 1297 n. 9 (9th Cir.1977) (same).

■ Finally, even if Mrs. Helmsley made a good faith mistake when she failed to segregate her personal property, her sufficiency defense fails as a matter of law. The government's showing of a deficiency can be rebutted by a recalculation showing an overpayment that is, under applicable law, mandatory. A showing of a deficiency cannot be rebutted by a recalculation based on the selection of the most favorable option, where other equally available options result in a deficiency. Padwe's testimony merely selected the most favorable option. If the original depreciation method selected by Mrs. Helmsley was a good faith mistake, she may still make a late election of depreciation periods under Section 168(b)(3) as well as under Section 168(b)(1). Resort to Section 168(b)(1) is, therefore, not mandatory. Under an exception to the doctrine of election, a taxpayer who makes a good faith mistake may make a late election. *See, e.g., Dougherty v. Commissioner*, 60 T.C. 917 (1973) (permitting late election under Section 962 where taxpayers mistakenly believed that they had no Section 951(a) gross income for taxable year at issue); *Reaver v. Commissioner*, 42 T.C. 72 (1964) (late installment sale election allowed where taxpayers erroneously but in good faith characterized payments received as gross receipts rather than proceeds from a sale of property); *Bayley v. Commissioner*, 35 T.C. 288 (1960) (permitting late installment sale election where taxpayer made good faith error on original return). It is a matter of public record that, for the reasons stated *supra*, the Internal Revenue Service applies this exception to Section 168 and allows taxpayers who have originally made a good faith mistake to make a late election of one of the options available under Section 168(b)(3) as well as under Section 168(b)(1). IRS Tech. Mem. 1986–46010 (July 21, 1986).

If Mrs. Helmsley had made a good faith mistake, therefore, she would be allowed to make a late election among four recovery periods for 5–year personal property. (Two of the periods were for five years but differed in the percentage to be depreciated annually.) Padwe's testimony, however, recalculated depreciation on the basis of

only one of the four recovery periods. In particular, he made no recalculation based on the two permissible longer periods available under Section 168(b)(3), each of which would have resulted in a deficiency. His recalculations within ACRS, rather than his application of ACRS, were thus elective rather than mandatory. Moreover, Padwe's adjustment of the depreciation rate on real property from 6.67% to 7.0% was based on a proposed, but never adopted, Treasury Regulation. Hence this adjustment was not mandatory either. We thus conclude that Padwe's testimony regarding an overpayment could have been excluded because it was based on assumptions at odds with relevant tax law.

■ Even if Padwe's testimony was admissible, it was not of sufficient weight to rebut as a matter of law the government's showing of a deficiency. As noted, Padwe's testimony was seriously undermined on cross-examination. Adjusting her sufficiency claim in light of the undermining of her expert's testimony, Mrs. Helmsley relies on an unusual burden-shifting argument. She claims that once she produced evidence of unclaimed deductions negating the government's prima facie case of tax deficiency, the government "bore the new burden of proving beyond a reasonable doubt that the untaken depreciation was not available or, if available, was not sufficient to offset the unreported income." Appellant's Reply Brief at 26. She further contends that the government could not carry this burden merely by providing the jury with a basis for discrediting Padwe. *Id.* at 29. This argument misstates the government's burden, however.

■ Under traditional principles, the government bears the burden throughout the trial of proving beyond a reasonable doubt all elements of tax evasion. *See In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970); *Davis v. United States*, 160 U.S. 469, 487, 16 S.Ct.

353, 358, 40 L.Ed. 499 (1895). So long as, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt, the trial judge must submit the question to the jury. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Taylor*, 464 F.2d 240, 242–43 (2d Cir.1972).

■ In the instant matter, the government established a prima facie case of tax evasion. We know of no reason to apply to tax evasion cases, and to proof of a deficiency in particular, unique and cumbersome notions of burden-shifting that appear to be justified solely by their usefulness to this appellant. It would belie common sense to hold that evidence of overpayment that has been undermined by cross-examination somehow creates a new burden upon the government. Like any evidence, evidence of overpayment ought simply to be weighed against evidence of underpayment, and the existence or nonexistence of a tax deficiency determined by the trier's balancing of the evidence. If the totality of the evidence was such that a rational juror could find the existence of a tax deficiency beyond a reasonable doubt, the jury's verdict must stand. We find that the evidence of a deficiency was sufficient in this case.

The government's cross-examination provided ample reason for a rational juror to reject Mrs. Helmsley's evidence of overpayment. In applying ACRS, Padwe calculated the reduced tax liability that would result from increased depreciation on buildings purchased during or shortly before 1983 through 1985 but did not calculate the increased tax liability that would result from the recapture of depreciation for buildings sold in those years.[6]

■ Moreover, Padwe did not examine the tax records of the more than one hundred Helmsley partnerships but rather

---

6. Mrs. Helmsley argues that, with respect to the recapture provisions, because she was required to pay the alternative minimum tax ("AMT") in 1983, any increase in her regular tax would be offset by a decrease in her AMT, leaving total federal income tax liability unchanged. *See* 26 U.S.C. § 55 (1982). Notwithstanding that this argument does not account for 1984 and 1985, the other years in controversy, it is deficient because AMT is merely a floor, and the jury was not required to speculate that the increased tax liability from property sales would not have been above that floor. The Helmsleys' 1983 joint personal income tax return alone reflected

only a sample given him by defense counsel. He thus testified that he was instructed by counsel to perform the ACRS adjustments for only fourteen specified partnerships, the selection of which he knew nothing about. After an evidentiary hearing on the admissibility of his testimony at which both the government and Judge Walker questioned him about the representativeness of his sample, Padwe "flipped through" the tax documents of about seventy more partnerships, focusing exclusively on partnerships that acquired property after 1981, the effective date of ACRS. The remaining Helmsley partnerships were not examined. There was thus ample reason for the jury to discount Padwe's conclusions as based on a wholly inadequate, and perhaps thoroughly biased, sample of partnerships that had acquired but not sold property in the relevant years.[7] Mrs. Helmsley's sufficiency claim as to the existence of a tax deficiency thus fails.[8]

### C. Constructive Amendment of the Indictment

 Mrs. Helmsley challenges her convictions on Count 1, Counts 8–10, and Counts 14–29 on the ground that the jury instructions unconstitutionally amended and expanded the offense alleged in the indictment. Under the Fifth Amendment, a criminal defendant has the right to be tried only on the charges contained in the indictment returned by a grand jury. *See Stirone v. United States,* 361 U.S. 212, 216–17, 80 S.Ct. 270, 272–73, 4 L.Ed.2d 252 (1960); *Ex Parte Bain,* 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887). An unconstitutional amendment of the indictment occurs when the charging terms are altered, either literally or constructively, such as when the trial judge instructs the jury. In contrast, a variance occurs when the charging terms are unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment. *See United States v. Zingaro,* 858 F.2d 94, 98–99 (2d Cir.1988). Variances are subject to the harmless error rule and thus are not grounds for reversal without a showing of prejudice to the defendant. Constructive amendments, however, are *per se* violative of the Fifth Amendment. *See id.* at 98; *United States v. Weiss,* 752 F.2d 777, 787

---

more than $31,700,000 in long-term capital gains from partnerships.

7. Contrary to Mrs. Helmsley's suggestion, this is not an instance where the government satisfied its burden of proof merely by discrediting a witness or by relying on the assumption that a taxpayer has claimed all available deductions. *See Small v. United States,* 255 F.2d 604, 607 (1st Cir.1958). In its prima facie case, the government introduced affirmative evidence of underreported income in 1983 through 1985. Moreover, it sought to discredit only evidence introduced to combat its prima facie case. *See United States v. Procario,* 356 F.2d 614, 617 (2d Cir.), *cert. denied,* 384 U.S. 1002, 86 S.Ct. 1923, 16 L.Ed.2d 1015 (1966).

8. Assuming *arguendo* that Padwe's testimony was admissible, we reject Mrs. Helmsley's three claims of error regarding Judge Walker's instructions pertinent to that testimony. She claims, first, that an instruction concerning the defense's "pre-select[ion]" of a limited number of partnerships for Padwe to examine was an improper invitation to the jury to speculate about unproven "offsets-to-the-offsets." However, Judge Walker was well within his discretion to note the implications of the fact that Padwe's analysis was admittedly not compre-

hensive. A trial judge may assist the jury by explaining and commenting on the evidence provided that he makes it clear to the jury that matters of fact are submitted for its final determination. *See Quercia v. United States,* 289 U.S. 466, 469–70, 53 S.Ct. 698, 698–99, 77 L.Ed. 1321 (1933). Judge Walker's instruction simply instructed the jury that it might, or might not, find that Padwe's analysis did not tell the entire story, and that it was free to draw, or not to draw, inferences from the pre-selection of partnerships for Padwe's examination. Second, she argues that Judge Walker's charge regarding the "conscious election" of depreciation methods was improper because there was no evidence to support it and irrelevant because the ACRS rules were mandatory during the years in question. Our discussion of the admissibility of Padwe's testimony disposes of this challenge. Third, she contends that Judge Walker's phrasing with respect to Mrs. Helmsley's defense—in particular: "[Y]ou may consider the evidence offered by the defense"—belittled her case and erroneously invited the jury to ignore the evidence that she presented. This is frivolous. Viewed in its entirety, the charge was evenhanded and in no way suggested to the jury that it was free to discard Mrs. Helmsley's defense. The gravamen of the charge was simply that the jury was bound to consider, but not bound to credit, Mrs. Helmsley's evidence.

(2d Cir.), *cert. denied*, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985).

A defendant is deprived of his right to be tried only on the charges returned by a grand jury when an essential element of those charges has been altered. *See Zingaro*, 858 F.2d at 98; *Weiss*, 752 F.2d at 787. Nevertheless, even an amendment or variance that does not alter an essential element may still deprive a defendant of an opportunity to meet the prosecutor's case. *See Weiss*, 752 F.2d at 789 (citing *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)). However, the indictment and the jury charge in the instant matter comported with one another in all essential respects, and Mrs. Helmsley had adequate notice of the conduct she was called upon to defend.

### 1. *Count 1: Conspiracy*

Count 1 charged defendants with conspiracy in violation of 18 U.S.C. § 371. Judge Walker instructed the jury that it could return a guilty verdict if they found that a conspiracy existed either to defraud the United States or to violate one of four specific federal statutes set forth in the indictment. These statutes were 26 U.S.C. § 7201 (income tax evasion), 26 U.S.C. § 7206(1) (filing false returns), 26 U.S.C. § 7206(2) (assisting in the filing of false returns), and 18 U.S.C. § 1341 (mail fraud). Mrs. Helmsley argues that the indictment alleged only the four specific statutory violations as objects of the conspiracy, and did not allege defrauding the United States as a fifth object.

The general federal conspiracy statute, 18 U.S.C. § 371 (1988), reads in pertinent part:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Section 371 thus defines two ways in which its provisions are violated: (1) conspiring to commit "offenses" that are specifically defined in other federal statutes, and (2) conspiring to "defraud the United States." These offenses overlap when the object of a conspiracy is a fraud on the United States that also violates a specific federal statute. *See United States v. Rosenblatt*, 554 F.2d 36, 40 (2d Cir.1977).

The instant indictment unambiguously charged Mrs. Helmsley under both the offense clause and the defraud clause. In plain terms, paragraph 25 alleged:

[Defendants] did unlawfully, wilfully and knowingly combine, conspire, confederate and agree together ... to commit offenses against the United States, to wit, violations of Title 26, United States Code, Sections 7201 and 7206, and Title 18, United States Code, Section[s] 1341, *and to defraud the United States and an agency thereof, to wit, the Internal Revenue Service of the United States Department of Treasury.*

(emphasis added). This statement, along with paragraphs 30–45, which detailed the particulars of the conspiracy, were sufficient to charge a defraud clause violation and to put Mrs. Helmsley on notice with respect to that violation. *See United States v. Lane*, 765 F.2d 1376, 1380 (9th Cir.1985).

Mrs. Helmsley argues that because her indictment did not employ the language of the indictment in *United States v. Klein*, 247 F.2d 908, 915 (2d Cir.1957), *cert. denied*, 355 U.S. 924, 78 S.Ct. 365, 2 L.Ed.2d 354 (1958)—"impeding, impairing, obstructing and defeating the lawful functions of the Department of the Treasury in the collection of the revenue; to wit, income taxes"—it did not sufficiently charge her with violating the defraud clause of Section 371. Although the *Klein* language may have become customary boilerplate in defraud clause indictments, it is not legally required. What is required is only that an indictment charging a defraud clause conspiracy set forth with precision "the essential nature of the alleged fraud." *Rosenblatt*, 554 F.2d at 42; *see Dennis v. United States*, 384 U.S. 855, 860, 86 S.Ct. 1840, 1843, 16 L.Ed.2d 973 (1966); *Russell v.*

*United States*, 369 U.S. 749, 765, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1962). Paragraphs 30–45, which particularize the alleged scheme to charge personal expenditures for Dunnellen Hall to Helmsley-controlled business entities, were more than sufficient to hone the broad language of Paragraph 25 into a pointed allegation of a specific fraud.

▆▆ Nor does the absence of defraud clause allegations in the section of Count 1 entitled "Objects of the Conspiracy" render the indictment defective. That section contained four paragraphs (numbers 26–29), reciting the language of each of the four federal statutes that the defendants allegedly conspired to violate. By definition there is no specific statutory language to recite in conjunction with the fifth object—defrauding the United States. As discussed, paragraphs 30–45 sufficiently detail that object to create a proper indictment. Thus, because Count 1 of the indictment alleged the same five objects as contained in the jury charge on that count, there is no chance that the jury convicted Mrs. Helmsley of something other than that for which she was indicted. *See United States v. Mollica*, 849 F.2d 723, 729 (2d Cir.1988); *Weiss*, 752 F.2d at 788–89.

▆▆ Alternatively, Mrs. Helmsley contends that, if Count 1 sufficiently alleged both offense clause and defraud clause violations of Section 371, then that count is invalidly duplicitous because of the possibility of a non-unanimous jury verdict. *See United States v. Gordon*, 844 F.2d 1397, 1401 (9th Cir.1988). She posits that some jurors may have convicted for offense clause violations and other jurors for a defraud clause violation. However, any possibility of a duplicitous verdict was removed by Judge Walker's careful charge regarding unanimity on Count 1:

> In this case, the defendants are charged with conspiring to accomplish five different illegal objectives. The first object the defendants are alleged to have agreed to accomplish is to defraud the United States, through its agency, the IRS. The next four objects involve alleged agreements to violate specific laws. The second object is to attempt to evade a substantial amount of taxes due and owing by Harry Helmsley and Leona Helmsley. The third object is to make and subscribe false personal, corporate and partnership tax returns. The fourth object is to aid and assist in the preparation and presentation of false personal, corporate and partnership tax returns. The fifth object is to carry out a scheme to defraud using the United States mails.
>
> However, you need not find that the defendants agreed to accomplish each and every one of these objectives. An agreement to accomplish any one of these objectives is sufficient. If the government fails to prove that at least one of the five objectives was an objective of the conspiracy in which the defendants participated, then you must find the defendants not guilty on the conspiracy count.
>
> However, if you find that any defendant agreed with another person to accomplish any one of the five objectives charged by the indictment, then you may find that defendant guilty of conspiracy if you find the other elements of the crime satisfied. However, *you must all agree on the specific object the defendant agreed to try to accomplish.*

(emphasis added). The charge thus allowed the jury to convict on one of five alternate grounds, but required it to be unanimous as to the particular ground selected.

### 2. *Counts 8–10: False Personal Returns*

Mrs. Helmsley's second claim of an unconstitutional amendment of the indictment challenges her convictions on Counts 8–10 for filing fraudulent federal personal income tax returns in violation of 26 U.S.C. § 7206(1). She argues that because the indictment alleged that *"substantial* items of income had been fraudulently omitted" (emphasis added) from returns submitted for tax years 1983, 1984 and 1985, and because Judge Walker imposed no requirement of substantiality when instructing the jury, she may have been convicted for conduct not specified by the grand jury. She

thus seeks a new trial on Counts 8–10.[9] This argument is frivolous.

■■■ Section 7206(1) provides:

[Any person who w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that is made under the penalties of perjury, and which he does not believe to be true and correct as to every matter . . .

shall be guilty of a felony. . . .

26 U.S.C. § 7206(1) (1988). False statements about income do not have to involve substantial amounts in order to violate this statute. *See, e.g., United States v. Citron,* 783 F.2d 307, 313–14 (2d Cir.1986); *United States v. Greenberg,* 735 F.2d 29, 31–32 (2d Cir.1984). The indictment's use of the word "substantial" was thus surplusage without legal significance in the context of Section 7206(1). Omitting that word in the jury charge in no way allowed the jury to convict Mrs. Helmsley for a different crime than that for which she was indicted. Indeed, the Supreme Court has specifically repudiated the proposition that "it constitutes an unconstitutional amendment to drop from an indictment those allegations that are unnecessary to an offense that is clearly contained within it." *United States v. Miller,* 471 U.S. 130, 144, 105 S.Ct. 1811, 1819, 85 L.Ed.2d 99 (1985).

### 3. *Counts 14–29: Aiding in the Filing of False Tax Returns*

■■■ The jury convicted Mrs. Helmsley on Counts 14–29, which charged aiding and assisting in the preparation or presentation of fraudulent tax returns for various Helmsley-controlled corporations and partnerships in violation of 26 U.S.C. § 7206(2). The evidence established that these Helmsley-controlled entities deducted as ordinary business expenses payments made in connection with the Dunnellen Hall project. Moreover, the evidence established that these deductions were itemized on the books and records of the business entities as operating expenditures and not as salary or compensation.

At trial, the government argued that corporate payments of personal expenses constituted constructive dividends to the Helmsleys, which are not properly deductible by the businesses.[10] However, the testimony of the government's tax expert on cross-examination implied that the payments were a form of salary compensation to the Helmsleys, which is properly deductible as a business expense.

On Counts 14–29, Judge Walker instructed the jury that it could convict the defendants either if the deductions were improperly taken (i.e. overstated) or if the deductions were properly taken, but mischaracterized:

An income tax return may be false, not only by reason of an understatement of income, but also because of an overstatement of lawful deductions or because deductible expenses are mischaracterized on the return.

. . . .

. . . Counts 14 through 29 charge that various corporate and partnership returns were false, because of an alleged willful overstatement of the amount of deductions allowed by the Internal Revenue laws, or because the deductions claimed were mischaracterized.

Reading the indictment to allege only overstatement, Mrs. Helmsley contends that Judge Walker constructively amended the indictment because he allowed the jury to convict for mischaracterization in addition to overstatement. We disagree.

Paragraph 58 of the indictment alleged:

[The defendants] unlawfully, knowingly and wilfully did aid and assist in, and procure, counsel and advise the preparation and presentation under, and in connection with matters arising under, the Internal Revenue Laws, of the U.S. Corporation and Partnership Income Tax Re-

---

**9.** Because we uphold Mrs. Helmsley's convictions on Counts 2–4, and her convictions on Counts 8–10 merge into those convictions as lesser included offenses, *see infra,* it is not strictly necessary for us to decide this question.

**10.** The constructive dividend theory was not applicable to the eleven of the sixteen counts charging Section 7206(2) violations based on partnership returns.

turns (Forms 1120 and 1065, respectively) for the Helmsley Organization business entities set forth below, which returns were false and fraudulent in that they included false and fraudulent business expense deductions.

It was followed by a list of sixteen tax returns on which the alleged falsehoods were entered. Later, a bill of particulars identified the precise lines on those returns charged to be false. Moreover, paragraphs 33–34, incorporated by reference in Counts 14–29, alleged that "millions of dollars of expenditures for Dunnellen Hall paid by business entities in the Helmsley Organization were falsely reflected on the books and records of those business entities as expenditures for the operation of the businesses" and "gave rise to millions of dollars of false and fraudulent tax deductions on the Federal and New York State income tax returns filed by those business entities for the years 1983, 1984 and 1985." In the context of Section 7206(2) "false and fraudulent" may mean mischaracterizing deductions as well as overstating them. *See United States v. Gurary*, 860 F.2d 521, 525 (2d Cir.1988), *cert. denied*, 490 U.S. 1035, 109 S.Ct. 1931, 104 L.Ed.2d 403 (1989); *United States v. Bliss*, 735 F.2d 294, 301 (8th Cir.1984). The jury instruction was thus consistent with the indictment and did nothing to amend it.

 The indictment and bill of particulars made it sufficiently clear that Mrs. Helmsley's assistance in entering the statements on the challenged lines of the tax forms violated Section 7206(2). Whether that violation occurred because the entries improperly stated deductions for what were essentially dividends or misleadingly characterized properly deductible compensation payments as other types of operating expenditures is inconsequential. In either case, what was entered on the tax return was false.

 For this reason, Mrs. Helmsley is also wrong in arguing that Judge Walker erred in not giving a specific unanimity charge. Such an instruction is needed where there exists "a genuine possibility of jury confusion or that a conviction may occur as the result of different jurors concluding that the defendant committed different acts." *United States v. Echeverry*, 719 F.2d 974, 975 (9th Cir.1983). However, Judge Walker's instruction that Section 7206(2) would be violated even if the deductions were allowable but mischaracterized was hardly complex.[11] The alleged offense involved a single predicate act: entering a false statement on a tax form. The requirement that unanimity exist as to the fact that the statement was false does not imply a need for unanimity as to why it was false, that is, agreement on the content of what would have been a correct statement. Moreover, a finding of overstatement through the creation of phony deductions necessarily includes a mischaracterization.

### D. *Mail Fraud*

In addition to filing federal tax returns in 1983, 1984 and 1985, the Helmsleys and Helmsley-controlled businesses filed New York State tax returns in those years. The government did not seek to prove an actual tax deficiency in New York. However, the parties did stipulate that certain information with respect to dividends, partnerships, and total income reported on the Helmsleys' New York State joint income tax returns was the same as the corresponding information reported on their joint federal income tax returns. They also stipulated that the New York State Corporation Franchise Tax Reports filed by certain Helmsley corporations contained taxable income figures derived from the corporations' federal returns.

For her participation in the preparation and submission of these state returns to the New York State Department of Taxation and Finance, Mrs. Helmsley was con-

---

**11.** We also reject Mrs. Helmsley's suggestion that Judge Walker's instruction on mischaracterization was so vague that jurors may have believed that any mischaracterizations anywhere by the defendants—such as creating pho- ny invoices—would violate Section 7206(2). The passage quoted above clearly indicates that misstatements must occur on the federal tax forms.

victed of ten counts of mail fraud under 18 U.S.C. § 1341. She claims that these convictions are invalid on two grounds. First, she argues that because there was no proof of taxes actually due to New York State, the alleged fraud did not deprive its victim of a property interest, as required by *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). Second, she argues that the mail fraud statute cannot apply in circumstances in which she was required to mail her state tax returns. We disagree as to both grounds.

In *McNally*, the Supreme Court held that Section 1341 did not extend to a scheme in which a state officer chose an insurance agent to provide coverage for the state and demanded kickback payments from the agent, but in which the state itself was defrauded of no money or property. *See* 483 U.S. at 360–61, 107 S.Ct. at 2881–82. The Court stated, "[t]he mail fraud statute clearly protects property rights, but does not refer to the intangible right of the citizenry to good government." *Id.* at 356, 107 S.Ct. at 2879. Unlike the conduct of the state official in *McNally*, Mrs. Helmsley's actions fall within the ambit of Section 1341, as construed by that decision.

*McNally* limited Section 1341 to schemes intended to deprive victims of money or property. *See United States v. King*, 860 F.2d 54, 55 (2d Cir.1988) (per curiam), *cert. denied*, 490 U.S. 1065, 109 S.Ct. 2062, 104 L.Ed.2d 628 (1989). In this case, Judge Walker explicitly instructed the jury that with respect to the mail fraud counts, it must find, *inter alia*, that the defendant "knowingly and wilfully participated in the scheme or artifice to obtain *money or property* by fraud." (emphasis added). In returning guilty verdicts on these counts, the jury therefore found a scheme to deprive New York State of money or property. The absence of proof of taxes actually due to New York State is immaterial because success of a scheme to defraud is not required. *See United States v. Bucey*, 876 F.2d 1297, 1311 (7th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 565, 107 L.Ed.2d 560 (1989).

To be sure, the absence of proof of taxes actually due may bear on the sufficiency of the evidence as to mail fraud. However, where the evidence of a scheme to charge personal expenses to business entities supports a conviction for federal tax evasion, where state tax returns were filed pursuant to the same scheme, and where certain entries on the state tax returns were derived from the corresponding federal returns, a juror could easily conclude beyond a reasonable doubt that the scheme was intended to deprive New York State of money or property. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

Nothing in *United States v. Porcelli*, 865 F.2d 1352 (2d Cir.), *cert. denied*, — U.S. ——, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989), precludes application of Section 1341 to the instant case. In *Porcelli*, we considered whether the mail fraud statute applied to the owner of several gasoline stations who filed state sales tax returns that underreported his businesses' sales, enabling him to avoid paying sizeable amounts of tax owed on sales. Because there was no evidence that Porcelli physically collected sales tax from his customers and withheld it from the government (in which case he literally would have deprived the state of its property), we had to confront whether the failure to collect and to remit sales taxes deprives the state of its property. Likening tax obligations to a chose in action, we found that the necessary property interest existed. *See* 865 F.2d at 1361. Generally, then, *Porcelli* stands for the proposition that Section 1341 applies to schemes to avoid paying taxes due.

Again, however, an actual tax debt is not an element of the mail fraud offense. Section 1341 punishes the *scheme*, not its success. *See Bucey*, 876 F.2d at 1311. Thus, if Mrs. Helmsley used the mails in an effort to defraud New York State of tax dollars owed to it, even if in the end she owed no taxes, the requisite elements of Section 1341 have been met.

In so holding, we reject Mrs. Helmsley's second argument that, because

her state tax returns were required to be mailed, she cannot be convicted under Section 1341 for those mailings. Assuming, without deciding, that she was prohibited from using any other delivery method, we reject her argument as a misreading of *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960). That case held that school district employees who looted the district of funds obtained through mailed tax assessments and remitted checks did not use the mails for the purpose of executing a fraud within the meaning of Section 1341. *Id.* at 393, 80 S.Ct. at 1184. The Court carefully limited its holding to the "particular circumstances of [the] case," relying on the facts that the school district was required to collect taxes, that the taxes assessed were not "padded," and that the assessment letters "contained no false pretense or misrepresentation." *Id.* at 391–92, 80 S.Ct. at 1184. The scheme was essentially one to steal funds that had been mailed, not to cause deception through the mails. *See id.* at 379–82, 80 S.Ct. at 1177–79. In contrast, Mrs. Helmsley's mailings contained, or so the jury found, fraudulent misrepresentations. Thus, they were " 'part[s] of the execution of the fraud.' " *Parr*, 363 U.S. at 391, 80 S.Ct. at 1183 (quoting *Kann v. United States*, 323 U.S. 88, 95, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944)).

### E. *Prosecutorial Misconduct*

On December 2, 1986, the day of the *New York Post* article describing Dunnellen Hall payments made by Helmsley-controlled businesses, Mr. Helmsley wrote a series of personal checks to reimburse those businesses for the amounts they had expended. In addition, on that day, Mr. and Mrs. Helmsley and HEI made payments to the Internal Revenue Service pursuant to Revenue Procedure 84–58, which provides for the posting of a cash bond to stop the running of interest and certain civil penalties during the course of an Internal Revenue Service audit or tax litigation.

Before trial, Mrs. Helmsley moved to preclude the government from mentioning

certain facts in its opening statement. One of these was

> Payments made in the nature of a cash bond to the Internal Revenue Service pursuant to Revenue Procedure 84–58 and related payments made by Harry Helmsley and held in suspense account in the Helmsley entities.

(citation omitted). In her supporting memorandum, however, Mrs. Helmsley referred only to the cash bond payments. She argued that, contrary to the government's interpretation, the payments did not constitute "an admission of tax liability or wrongdoing" but were merely part of a regulatory procedure to avoid accumulating interest and penalty obligations during an ongoing dispute with the Internal Revenue Service. As such, she argued, they were irrelevant to the charges against her and should be excluded from the opening statement. In its letter of response, the government also addressed only the payments to the IRS and stated that it regarded them as "admissions of wrongdoing."

A short colloquy regarding the prosecution's proposed reference to the "cash bond payment" in its opening statement took place at the start of the trial. Attorneys for Mrs. Helmsley argued that Mr. Helmsley's payments to the IRS did not constitute an admission, and even if they did, because he was no longer a party to the case, there was no connection between the payment and the remaining defendants. Mr. Helmsley's separate reimbursement of his businesses was not mentioned. After the colloquy, Judge Walker said, "I will exclude *it*. . . . I am directing the prosecutor not to refer to *it* in his opening statement." (emphasis added).

That afternoon, DeVita gave the government's opening statement. At one point he discussed the year 1986, when Helmsley businesses allegedly discontinued paying Dunnellen Hall expenses because ownership of the mansion was transferred from the Helmsleys personally to a holding corporation. DeVita alleged that new accountants for the Helmsley businesses were considering "how to correct the improper tax consequences of the Dunnellen

96

Hall payments before the IRS detected them." The following colloquy then took place:

MR. DEVITA:

. . . .

Amended returns were again discussed but once again nothing was done. In fact, nothing was ever done until December 2, 1986, which was the very day that the New York Post published a front page story describing and disclosing the Dunnellen Hall payments.

On that same day Harry Helmsley issued 18 checks—

MR. BRODSKY: Objection, your Honor.

THE COURT: Overruled.

MR. BRODSKY: Your Honor, may we have a side bar on this? You excluded this earlier.

THE COURT: No. Be seated.

MR. DEVITA: On that same day Harry Helmsley issued 18 checks totaling over $5 million to repay the companies that had made the payments for Dunnellen Hall with interest.

Those frank admissions of guilt proved too little too late, because once the scheme was exposed the criminal investigation was started and this case is the result.

On appeal, Mrs. Helmsley argues that DeVita's reference to payments by Mr. Helmsley and his characterization of those payments as "frank admissions of guilt" violated Judge Walker's earlier ruling and irreparably prejudiced her entire case. She demands a new trial on all counts.

The prosecutor's comments on Mr. Helmsley's reimbursement of his businesses did not literally violate the court's order limiting the content of the government's opening statement. Both sides' memoranda and the discussion at the hearing focused exclusively on the cash bond payment to the IRS, not Mr. Helmsley's separate payments to the Helmsley entities. In excluding "it," Judge Walker ruled only

with respect to the IRS payments.[12] Whether it was misconduct for the prosecutor to refer to Mr. Helmsley's reimbursement payments and to characterize them as "frank admissions of guilt" is a close question. The logic of Judge Walker's decision to preclude mention of the payments to the IRS would apply equally to the reimbursement payments if the ground for his decision was the lack of any connection between the IRS payments and the defendants on trial. If the ground was that the IRS payments were intended to stop the accumulation of interest and penalties, however, that logic would not apply to the reimbursement payments.

Even if the remarks were improper, however, there would be ground for reversal only if "the statements, viewed against 'the entire argument before the jury' deprived the defendant of a fair trial." *United States v. Wilkinson*, 754 F.2d 1427, 1435 (2d Cir.) (quoting *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 242, 60 S.Ct. 811, 853, 84 L.Ed. 1129 (1940)), *cert. denied sub nom. Shipp v. United States*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985). In assessing whether a prosecutor's behavior amounted to "prejudicial error," *see United States v. Young*, 470 U.S. 1, 11–12, 105 S.Ct. 1038, 1044–45, 84 L.Ed.2d 1 (1985), we have focused on (1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the certainty of conviction absent the misconduct. *See United States v. Friedman*, 909 F.2d 705, 709 (2d Cir.1990). A consideration of these factors weighs overwhelmingly against reversal of Mrs. Helmsley's convictions.

■ The most serious aspect of DeVita's statements was the characterization that Mr. Helmsley's payments constituted "frank admissions of guilt," arguably a substantial exaggeration of the payments' significance to the case. However, we are confident that no prejudice resulted. Dur-

12. Indeed, the only pretrial mention of the business reimbursement payment appears to have been in Mrs. Helmsley's motion to exclude, which in addition to the IRS payments referred to "related payments made by Harry Helmsley and held in suspense account in the Helmsley entities." *See supra*. This issue was not elaborated on in the body of the supporting memorandum or in the pretrial colloquy, however.

ing the course of the trial, Judge Walker declined to admit evidence of both sets of payments on December 2, in part because of an insufficient nexus to the defendants. After the government's opening statement, this topic was never mentioned again in the jury's presence over the course of a trial that lasted for two months and included dozens of witnesses and stacks of documents. In the flood of evidence that followed over the next several weeks, DeVita's brief comments were rendered wholly insignificant.

## F. *The Sentence*

Mrs. Helmsley challenges various aspects of her sentence. First, she argues that her term of four years' incarceration is invalid because it was premised on an assumed, but unproven, dollar amount of taxes evaded. Second, she claims that, if her convictions on the tax evasion counts are valid, then her convictions for filing false personal returns, Counts 8–10, and assisting the filing of false corporate and partnership returns, Counts 14–29, must merge with them and the sentences on those counts must be vacated. Third, Mrs. Helmsley contends that the district court had no power to order restitution for tax crimes, and even if it did, it was improper to order restitution in amounts representing supposed, but not adjudicated, taxes

due to federal and state authorities. Finally, she claims that the $7,152,000 fine assessed against her exceeds a statutory limit on aggregate fines. The government concedes that Counts 8–10 merge into Counts 2–4, but contests the rest of Mrs. Helmsley's claims.

### 1. Incarceration

Mrs. Helmsley objects to her sentence to the extent that it was based on the amount of taxes actually evaded—allegedly $1,221,-900 in federal taxes and $469,300 in state taxes—because those specific figures were never determined at trial.[13] To convict Mrs. Helmsley on Counts 2–4 for tax evasion under 26 U.S.C. § 7201 the jury had to find a substantial tax deficiency, *see supra,* but did not need to agree upon a specific dollar amount. Nor was the jury required to find even the existence of a state tax deficiency to convict on Counts 30–39 for committing fraud on New York State by mailing false state tax returns in violation of 18 U.S.C. § 1341. Mrs. Helmsley thus argues that, because the exact amount of any tax deficiency has not been finally adjudicated, the district court was barred from relying on the purported figures to determine her punishment.

This argument ignores Fed. R.Crim.P. 32(c),[14] which provides the meth-

---

**13.** We note our skepticism that the amounts involved affected Mrs. Helmsley's term of imprisonment at all. Judge Walker announced his intention to be consistent with the Sentencing Guidelines, although he was not formally bound by them. The Guideline range computed by the Probation Department, which was *not* influenced by the amount of tax allegedly evaded, was 41–51 months. Judge Walker's order of 48 months imprisonment was thus within this range.

**14.** The version of the Rule applicable to Mrs. Helmsley's offenses, in effect prior to amendment by the Sentencing Reform Act of 1984, Pub.L. No. 98–473, § 215(a), 98 Stat. 1837, 2014 (1984), read in pertinent part:

**(c) Presentence Investigation.**

**(1) When Made.** The probation service of the court shall make a presentence investigation and report to the court before the imposition of sentence or the granting of probation unless, with the permission of the court, the defendant waives a presentence investigation and report, or the court finds that there is in

the record information sufficient to enable the meaningful exercise of sentencing discretion, and the court explains this finding on the record.

. . . .

**(2) Report.** The presentence report shall contain—

**(A)** any prior criminal record of the defendant;

**(B)** a statement of the circumstances of the commission of the offense and circumstances affecting the defendant's behavior;

**(C)** information concerning any harm, including financial, social, psychological, and physical harm, done to or loss suffered by any victim of the offense; and

**(D)** any other information that may aid the court in sentencing, including the restitution needs of any victim of the offense.

**(3) Disclosure.**

**(A)** At a reasonable time before imposing sentence the court shall permit the defendant and the defendant's counsel to read the report of the presentence investigation exclusive of

od by which sentencing judges obtain objective and accurate information relating to the defendant and her crime. *See* 3 C. Wright, *Federal Practice and Procedure: Criminal,* § 522, at 49 (2d ed. 1982). That rule instructs the Probation Department to conduct a presentence investigation and submit to the sentencing court a report containing, *inter alia,* a statement of the circumstances of the commission of the offense and information concerning any harm—including financial harm—done to any victim of the offense. At a reasonable time before sentencing, the court must afford the defendant an opportunity to read and comment on the report and to object to any alleged factual inaccuracy contained in it. If an inaccuracy is alleged, the court must make a finding as to the controverted matter or refrain from taking that matter into account in sentencing. *See supra* note 14. If no such objection is made, however, the sentencing court may rely on information contained in the report. *See United States v. Aleman,* 832 F.2d 142, 144 (11th Cir.1987); *cf. United States v. Fatico,* 579 F.2d 707, 713 (2d Cir.1978) (permitting the use of reliable hearsay evidence in sentencing). Moreover, if a defendant fails to object to certain information in the presentence report, she is barred from contesting the sentencing court's reliance on that information, unless such reliance was plain error. *See United States v. Brody,* 808 F.2d 944, 946–47 (2d Cir.1986).

In the instant matter, the Probation Department conducted a presentence investigation and prepared a report pursuant to Rule 32(c). That report made specific findings as to the amounts of tax evaded—$1,221,900 plus interest in federal tax and $469,300 in New York State taxes. Mrs. Helmsley received a copy of this report in sufficient time to read and object to it. In fact, she responded to it in a letter to Judge Walker dated December 6, 1989. Nothing in that letter specifically contested the tax evasion figures presented in the presentence report. To the contrary, in arguing for leniency, she accepted the correctness of the figures by claiming that the ratio "of federal taxes actually paid by the Helmsleys over the relevant three year period ($34.8 million) to *the amount of taxes owing for the same period ($1.2 million)"* (emphasis added), about thirty to one, was a mitigating circumstance. At the December 12, 1989 sentencing hearing, her counsel advanced the same argument explicitly using the same numbers. While at another point in her letter Mrs. Helmsley objected to "a thematic reluctance in the Report to draw any conclusion favorable to Mrs. Helmsley," such general assertions as to tone do not constitute the specific factual objection necessary to trigger the judicial inquiry procedures of Rule 32(c). *See Aleman,* 832 F.2d at 145. Judge Walker was thus entitled to rely upon the tax evasion figures of the presentence report in sentencing Mrs. Helmsley.[15]

any recommendation as to sentence, but not to the extent that in the opinion of the court the report contains diagnostic opinions which, if disclosed, might seriously disrupt a program of rehabilitation; or sources of information obtained upon a promise of confidentiality; or any other information which, if disclosed, might result in harm, physical or otherwise, to the defendant or other persons. The court shall afford the defendant and the defendant's counsel an opportunity to comment on the report and, in the discretion of the court, to introduce testimony or other information relating to any alleged factual inaccuracy contained in it.

. . . .

**(D)** If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing. A written record of such findings and determinations shall be appended to and accompany any copy of the presentence investigation report thereafter made available to the Bureau of Prisons or the Parole Commission.

*See* former Fed.R.Crim.P. 32, 18 U.S.C.A. (Supp. 1991) (Rule applicable to offenses committed prior to Nov. 1, 1987).

**15.** Such reliance was in no way plain error under Fed.R.Crim.P. 52(b). It is a violation of due process to base a sentence on a material misapprehension of fact. *See United States v. Tucker,* 404 U.S. 443, 447–49, 92 S.Ct. 589, 591–93, 30 L.Ed.2d 592 (1972). However, we believe

## 2. Merger

Section 7201 of the Internal Revenue Code, the "capstone" of the comprehensive statutory scheme prohibiting and punishing federal tax fraud, *see Spies v. United States,* 317 U.S. 492, 497, 63 S.Ct. 364, 367, 87 L.Ed. 418 (1943), prohibits any attempt to evade or defeat any tax in any manner and provides that such an attempt is punishable as a felony. *See* 26 U.S.C. § 7201 (1988). A series of sections prohibiting specific methods of fraud in the collection and payment of taxes, all of which are separately punishable, follows Section 7201. *See United States v. White,* 417 F.2d 89, 93–94 (2d Cir.1969), *cert. denied,* 397 U.S. 912, 90 S.Ct. 910, 25 L.Ed.2d 92 (1970). Among these are Section 7206(1), criminalizing the signing of false tax returns under oath, and Section 7206(2), criminalizing aiding or assisting in the filing of a false tax return.

We have held that where false returns "were 'incidental step[s] in the consummation of the completed offense of attempted defeat or evasion of tax' and as such ... constituted a 'crime within [a] crime' under the lesser included offense doctrine" then a conviction under Section 7206(1) for filing those false returns merges into a convic-tion under Section 7201 for the inclusive fraud of tax evasion. *White,* 417 F.2d at 93–94 (quoting *Gaunt v. United States,* 184 F.2d 284, 290 (1st Cir.1950), *cert. denied,* 340 U.S. 917, 71 S.Ct. 350, 95 L.Ed. 662 (1951)); *see also Sansone v. United States,* 380 U.S. 343, 349, 85 S.Ct. 1004, 1009, 13 L.Ed.2d 882 (1965) (Sections 7203 and 7207 are lesser included offenses within Section 7201 in appropriate case).

The parties agree that Mrs. Helmsley's convictions on Counts 8–10 merge with her convictions on Counts 2–4. Counts 2–4 charged Mrs. Helmsley with attempting to evade personal income tax by deliberately omitting from the pertinent joint tax returns income received in the form of payment of personal expenditures by Helmsley business entities. Counts 8–10 charged that those returns were false for the same reason: they omitted items of income. Because both sets of counts are premised on the same act, the false filing was incidental to tax evasion and constitutes a lesser included offense.

Counts 14–29 charged that Mrs. Helmsley aided and assisted in the preparation and filing of corporate and partnership returns that included false and fraudulent deductions.[16] Mrs. Helmsley claims that

that there was a more than sufficient basis for the Probation Department to support its conclusions as to the magnitude of taxes owed. *Cf. United States v. Fatico,* 603 F.2d 1053, 1057 (2d Cir.1979), *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980). At trial, the government presented evidence of Mrs. Helms-ley's federal tax deficiency, and the amount of state tax involved was easily derived from the Helmsleys' New York State income tax returns.

16. The entities involved in Counts 14–29 are as follows:

| COUNT | BUSINESS ENTITY FILING RETURN | TAX RETURN |
|---|---|---|
| 14 | HEI | Corporate Form 1120 F/Y/E 6/30/84 |
| 15 | HEI | Corporate Form 1120 F/Y/E 6/30/85 |
| 16 | Realesco | Corporate Form 1120 Y/E 12/31/83 |
| 17 | Realesco | Corporate Form 1120 Y/E 12/31/84 |
| 18 | Realesco | Corporate Form 1120 16 months ending 4/30/86 |
| 19 | Garden Bay Manor Associates | Partnership Form 1065 Y/E 12/31/83 |
| 20 | Garden Bay Manor Associates | Partnership Form 1065 Y/E 12/31/84 |
| 21 | Garden Bay Manor Associates | Partnership Form 1065 Y/E 12/31/85 |
| 22 | 166 E. 61st St. Associates | Partnership Form 1065 Y/E 12/31/84 |
| 23 | 166 E. 61st St. | Partnership Form 1065 |

her convictions on these counts also merge. We disagree as to Counts 14–28. Unlike the filing of false personal returns, Counts 14–28 involve criminal conduct beyond the evasion of personal income taxes. Counts 2–4 are thus not inclusive of the crimes charged in Counts 14–28, and Mrs. Helmsley's convictions on these counts must stand. We agree, however, that her conviction on Count 29 must merge.

The government proved at trial that the Helmsley business entities involved in Counts 14–29 claimed phony business expense deductions in association with payments made for Dunnellen Hall. In Counts 14–28 these fraudulent deductions affected the tax returns of taxpaying entities other than Mr. and Mrs. Helmsley. Counts 14–18 involve two corporations, HEI and Realesco. Counts 19–28 involve a number of partnerships, in each of which a Helmsley corporation possessed an ownership stake.[17] Thus, Mrs. Helmsley's assistance in claiming the fraudulent deductions provided taxpayers other than herself with illegal tax benefits in 1983, 1984 and 1985. To this extent, her conduct exceeds the bounds of a scheme to evade personal taxes in those years. Her convictions on Counts 14–28, therefore, do not merge into those on Counts 2–4.

Even though Mr. Helmsley was a partner in some of the partnerships involved in Counts 14–28, our ruling is consistent with

*United States v. Slutsky,* 487 F.2d 832 (2d Cir.1973), *cert. denied,* 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 287 (1974). In that case, the two defendants, equal partners in a resort hotel, underreported the income of their partnership. Each was convicted of making and subscribing to a false partnership return in violation of Section 7206(1) and attempting to evade personal income taxes in violation of Section 7201. *Id.* at 835. *Slutsky* held that, because a partnership is not in itself a taxable entity and the partners are liable as individuals for the income from their respective partnership shares, underreporting income on the partnership returns was incidental to the tax evasion. The Section 7206(1) convictions thus merged with the Section 7201 convictions. *Id.* at 845.

Crucial to the reasoning in *Slutsky* was the fact that contemporaneous filing of the false partnership and individual returns did not enhance the deceptive effect caused by the filing of false individual returns. *See id.* That was the case, however, only because each partner was subject to personal tax evasion charges. False partnership information thus had no illegal tax effect beyond what was charged in the tax evasion counts.

In the instant case, with respect to Counts 14–28, not all of the partners in the partnerships that claimed false deductions were indicted for tax evasion. The false information provided illegal tax benefits to

| | | |
|---|---|---|
| | Associates | Y/E 12/31/85 |
| 24 | Windsor Park Apts. Associates | Partnership Form 1065 Y/E 12/31/84 |
| 25 | 230 Park Ave. Associates | Partnership Form 1065 Y/E 12/31/84 |
| 26 | 230 Park Ave. Associates | Partnership Form 1065 Y/E 12/31/85 |
| 27 | Graybar Bldg. Co. | Partnership Form 1065 Y/E 12/31/84 |
| 28 | Graybar Bldg. Co. | Partnership Form 1065 Y/E 12/31/85 |
| 29 | Middletowne Associates | Partnership Form 1065 Y/E 12/31/85 |

17. The partners in Garden Bay Manor Associates were Mr. Helmsley and a wholly owned subsidiary of HEI (until Mr. Helmsley sold his interest to Helmsley Hotels in 1985). The partners in 166 East 61st Street Associates were Helmsley Hotels and a wholly owned subsidiary of HEI. The partners in Windsor Park Apartments Associates were Helmsley Hotels and a wholly owned subsidiary of HEI. The partners in 230 Park Avenue Associates were Mr. Helmsley and Helmsley Hotels. The partners in Graybar Building Company were Helmsley Hotels and Hospitality Services Company, a partnership owned by Mr. Helmsley and a wholly owned subsidiary of HEI.

corporations not subject to the tax evasion charge. Thus Counts 2–4 were *not* inclusive of Counts 14–28, because the latter counts involved criminal conduct with effects beyond Mrs. Helmsley's attempt to evade personal income taxes in 1983, 1984 and 1985.

The result is different, however, for Count 29. That count involved Middletowne Associates, whose sole partners were Mr. and Mrs. Helmsley. Thus, the false tax information with respect to this partnership bestowed no collateral illegal tax benefit beyond what was charged in the tax evasion counts. Under the logic of *Slutsky*, therefore, Mrs. Helmsley's conviction on Count 29 must merge.

In sum, we conclude that only Mrs. Helmsley's convictions on Counts 8–10 and Count 29 merge with her convictions on Counts 2–4.

### 3. Restitution

■ In addition to imposing the term of imprisonment and a fine, Judge Walker ordered Mrs. Helmsley "to pay restitution to the U.S. government of taxes owed, in the amount of $1,221,900.00, and all penalties and interest thereon, and restitution to New York State, in the amount of $469,300.00 and interest thereon." Mrs. Helmsley contends that the district court lacked authority to order restitution, adding that, even if the court had such power, it was improper to fix the amount of taxes due and order restitution where no formal tax liability had been adjudicated. We disagree.

■ Federal courts have no inherent power to order restitution. Such authority must be conferred by Congress. *See United States v. Elkin*, 731 F.2d 1005, 1010–11 (2d Cir.), *cert. denied*, 469 U.S. 822, 105 S.Ct. 97, 83 L.Ed.2d 43 (1984). At the time of Mrs. Helmsley's offenses two statutes relating to restitution were in effect. First, the Federal Probation Act, formerly codified at 18 U.S.C. §§ 3651–56 and re-

pealed effective November 1, 1987, authorized a sentencing court to order restitution only as a condition of probation. *See Elkin*, 731 F.2d at 1011. Second, the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663, enacted in 1982 and still in effect, authorized restitution only for violations of Title 18 of the United States Code and for certain offenses under the Federal Aviation Act of 1958, 49 U.S.C.App. § 1472. *See* 18 U.S.C. § 3663(a) (1988). Judge Walker did not specify under which statute he was acting, but the Federal Probation Act is clearly inapplicable because Mrs. Helmsley's restitution was not imposed as a condition of her probation. We must thus determine whether Judge Walker had authority under the VWPA to order restitution. We conclude that he did.

■ Mrs. Helmsley's convictions for conspiracy under Count 1 and mail fraud under Counts 30–39 were for violations of Title 18—18 U.S.C. § 371 and 18 U.S.C. § 1341, respectively. The VWPA thus applies.[18] Mrs. Helmsley argues, however, that a district court is barred from ordering restitution under VWPA for tax-related offenses because Congress has not authorized restitution for violations of Title 26, the Internal Revenue Code. This argument is misguided, however, because, as we explain *infra* in our discussion of the fines imposed for these counts, conspiracy and mail fraud are crimes distinct from their underlying predicate acts and purposes, and involve additional harms. Moreover, nothing in Section 3663 limits the court's power to order restitution in such instances. Finally, the Internal Revenue Service and the State of New York can be "victims" under the VWPA. *Cf. United States v. Kirkland*, 853 F.2d 1243, 1246 (5th Cir.1988) (Farmers Home Administration victim); *United States v. Sunrhodes*, 831 F.2d 1537, 1545–46 (10th Cir.1987) (Indian Health Service victim); *United States v. Gallup*, 812 F.2d 1271, 1281 (10th Cir. 1987) (Department of Housing and Urban

---

**18.** Section 3663(a) reads:

> The court, when sentencing a defendant convicted of an offense under this title ... may order, in addition to or, in the case of a

misdemeanor, in lieu of any other penalty authorized by law, that the defendant make restitution to any victim of such offense.

18 U.S.C. § 3663 (1988).

Development victim); *United States v. Ruffen,* 780 F.2d 1493, 1496 (9th Cir.) (county agency victim), *cert. denied,* 479 U.S. 963, 107 S.Ct. 462, 93 L.Ed.2d 407 (1986); *United States v. Fountain,* 768 F.2d 790, 802 (7th Cir.1985) (Department of Labor victim), *cert. denied,* 475 U.S. 1124, 106 S.Ct. 1647, 90 L.Ed.2d 191 (1986).

■■■ Mrs. Helmsley contends that, even if the district court had the power to order restitution, it could not order her to pay a sum of taxes allegedly due without a formal adjudication of that amount. While there is authority for this position, *see, e.g., United States v. Franks,* 723 F.2d 1482, 1487 (10th Cir.1983), *cert. denied,* 469 U.S. 817, 105 S.Ct. 85, 83 L.Ed.2d 32 (1984); *United States v. Touchet,* 658 F.2d 1074, 1076 (5th Cir.1981); *United States v. White,* 417 F.2d 89, 94 (2d Cir.1969), *cert. denied,* 397 U.S. 912, 90 S.Ct. 910, 25 L.Ed.2d 92 (1970); *United States v. Taylor,* 305 F.2d 183, 187–88 (4th Cir.), *cert. denied,* 371 U.S. 894, 83 S.Ct. 193, 9 L.Ed.2d 126 (1962); *United States v. Stoehr,* 196 F.2d 276, 284 (3d Cir.), *cert. denied,* 344 U.S. 826, 73 S.Ct. 28, 97 L.Ed. 643 (1952), we hold, for the reasons stated in our discussion of Fed.R.Crim.P. 32(c), *supra,* that Mrs. Helmsley has waived her opportunity to contest the amount of restitution. In *Stoehr,* the basis for the authorities cited immediately above, the court stated,

> Since the exact amount due the government is not normally determined in a criminal action such as this, determination of the amount owed must await either *defendant's acquiescence in the government's assessment of deficiency,* or else final judicial adjudication.

196 F.2d at 284 (emphasis added). We believe that Mrs. Helmsley's failure to object to the figures of $1,221,900 and $469,300 in the presentence report and her adoption of the former figure in arguing mitigating circumstances constitute such acquiescence. Rule 32 clearly contemplates that the Probation Department will gather information on which to base restitution. *See* former Fed.R.Crim.P. 32(c)(2)(D) (presentence report shall contain "any other information that may aid the court in sentencing, including the restitution needs of any victim of the offense"). Having failed to avail herself of the opportunity under that Rule to seek a judicial finding with respect to the amount of taxes owed, *cf. United States v. Weichert,* 836 F.2d 769, 772 (2d Cir.1988), *cert. denied,* 488 U.S. 1017, 109 S.Ct. 813, 102 L.Ed.2d 802 (1989), she acquiesced in the presentence report.

■■■ We disagree with our dissenting colleague that restitution may not be imposed in a tax evasion case. It is true that the government may pursue a tax evader for unpaid taxes, penalties and interest in a civil proceeding. However, we believe it is self-evident that any amount paid as restitution for taxes owed must be deducted from any judgment entered for unpaid taxes in such a civil proceeding. Restitution is in fact and law a payment of unpaid taxes.

### 4. The Aggregate Fine

■■■ Judge Walker ordered Mrs. Helmsley to pay fines as follows: (1) a fine of $250,000 and a $50 special assessment on each of Counts 1, 3, 4, 9, 10, 14, 15, 17, 18, 20–29, and 31–38; (2) a fine of $100,000 on each of counts 2, 8, 16 and 19; and (3) a fine of $1,000 on each of Counts 30 and 39, for a total in fines of $7,152,000 and special assessments of $1,350. Mrs. Helmsley argues that this total is invalid because it exceeds the limit on aggregate fines imposed by the Criminal Fine Enforcement Act of 1984, Pub.L. No. 98–596, § 6(a), 98 Stat. 3134, 3137. We find this statutory capping provision inapplicable to her case.

Section 6(a) of the Criminal Fine Enforcement Act added Section 3623 to Title 18 of the United States Code. Its pertinent part, Section 3623(c)(2), provided:

> [T]he aggregate of fines that a court may impose on a defendant at the same time for different offenses that arise from a common scheme or plan, and that do not cause separable or distinguishable kinds of harm or damage, is twice the amount imposable for the most serious offense.

Pub.L. No. 98–596, § 6(a), 98 Stat. at 3137. Repealed when the Sentencing Reform Act

of 1984 became effective, *see* Pub.L. No. 98–473, §§ 212(a)(2), 235(a)(1), 98 Stat. 1987, 2031 (1984), as amended by Pub.L. No. 99–217, § 4, 99 Stat. 1728 (1985), Section 3623 applies to offenses committed between December 31, 1984 and November 1, 1987. Mrs. Helmsley argues that in her case, the maximum fine is $500,000, twice the $250,000 fine imposable on any of the counts.[19]

Her contention is wrong, however, because, although her offenses "arise from a common scheme or plan," they "cause separable or distinguishable kinds of harm or damage." Her offenses thus do not satisfy the prerequisite of Section 3623(c)(2). *See United States v. Ramirez–Amaya,* 812 F.2d 813, 816–17 (2d Cir.1987).

Counts 2–4 charged evasion of personal income taxes, the harm of which is self-evident. Count 1 charged conspiracy, which, because of the involvement of multiple parties, traditionally has been viewed as an offense that causes harm distinguishable from the harm caused by the underlying substantive offenses. *See Ramirez–Amaya,* 812 F.2d at 817 (citing *Callanan v. United States,* 364 U.S. 587, 593–94, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 (1961); *United States v. Rabinowich,* 238 U.S. 78, 88, 35 S.Ct. 682, 684, 59 L.Ed. 1211 (1915)). Counts 8–10 and Counts 14–29 charged filing false returns. We have already ruled that the convictions on Counts 8–10 and Count 29 merge with the convictions on Counts 2–4. The behavior charged in Counts 14–28, as we discussed in addressing the merger question, provided illegal tax benefits to corporate entities, and thus involved a harm distinct from personal tax evasion. Counts 30–39 charged mail fraud and involved a separate harm to the United States postal system and to New York State. Finally, within each of these sets of counts, the individual counts each involved distinct incidents of fraudulent entries on

tax returns, each of which was a separate affront to the government's interest in obtaining accurate tax information. *See, e.g., United States v. Greenberg,* 735 F.2d 29, 31–32 (2d Cir.1984). Given the separate and distinguishable nature of the harms caused by the actions for which Mrs. Helmsley was convicted, we hold that Section 3623(c)(2) is inapplicable.

## CONCLUSION

For the reasons stated above, we affirm Mrs. Helmsley's convictions. However, because her convictions on Counts 8–10 and Count 29 merge as lesser included offenses with her convictions on Counts 2–4, we vacate her sentences on both sets of counts and remand to the district court to combine the two sets of convictions and resentence Mrs. Helmsley under the convictions on Counts 2–4. *See United States v. Moskowitz,* 883 F.2d 1142, 1151–52 (2d Cir.1989).

OAKES, Chief Judge, concurring in part and dissenting in part:

I concur in so much of the panel majority as affirms the convictions on count one, the conspiracy count, counts eight through ten, the false return counts, and counts fourteen through twenty-nine, the aiding and abetting the filing of false corporate and partnership return counts. There was ample proof that Mrs. Helmsley conspired to cheat the Government of taxes, filed false personal tax returns to that end, and assisted or indeed directed the filing of false corporate and partnership returns to consummate the scheme. Judge Winter's comprehensive opinion more than adequately addresses Mrs. Helmsley's claims (violation of the Fifth Amendment, amendment of the indictment, and prosecutorial misconduct), and is correct on resentencing, as far as it goes.

**19.** Some of the counts involving taxes for calendar year 1983, Counts 2, 8, 16, 19, 30 and 39, involve acts committed before December 31, 1984. Mrs. Helmsley argues that because the 1983 returns were part of the same alleged scheme, the capping provision of Section 3623(c)(2) should apply to convictions on these counts as well. We do not reach this issue,

because we conclude that that provision does not apply to any of Mrs. Helmsley's convictions. In any event, Judge Walker imposed only the fine set forth in the statute creating the offense on these counts, and not the $250,000 maximum newly permitted by Section 3623(a)(3). *See* Pub.L. No. 98–596, § 6(a), 98 Stat. at 3137.

For reasons that I will spell out below, however, I would reverse her convictions on counts two through four, the evasion counts, and counts thirty through thirty-nine, the mail fraud counts. I also do not believe that the Victim and Witness Protection Act (VWPA) permits the court to order restitution of taxes owed or interest or penalties to the United States as "victim," *see United States v. Joseph*, 914 F.2d 780, 784 (6th Cir.1990) (VWPA permits restitution only for Title 18 offenses, not Title 26 offenses), when Congress already has a comprehensive scheme in the Internal Revenue Code for the recovery of taxes, interest and penalties, through civil actions, with liens, forfeitures and jeopardy assessments, among other things. *See, e.g.,* 26 U.S.C. §§ 6651(a) (interest of up to 25 percent in case of failure to file a return), 6653(b), (d) (75 percent penalty for underpayments attributable to fraud), 6851 (jeopardy assessment of income when assessment or collection of deficiency jeopardized by delay).

## I

As to the tax evasion counts, as the majority agrees, if there has not been proof beyond a reasonable doubt of a deficiency, there cannot be proof of tax evasion. *Sansone v. United States*, 380 U.S. 343, 351, 85 S.Ct. 1004, 1010, 13 L.Ed.2d 882 (1965); *Lawn v. United States*, 355 U.S. 339, 361, 78 S.Ct. 311, 323, 2 L.Ed.2d 321 (1958); *United States v. Koskerides*, 877 F.2d 1129, 1137 (2d Cir.1989). Thus, accepting the fact that they (or Mrs. Helmsley) clearly had the intent to evade paying some of their taxes, if Mrs. Helmsley paid more taxes than were due on her personal income for the three years in question, she could be prosecuted for false statements made on her returns, 26 U.S.C. § 7206(1), but not for tax evasion under 26 U.S.C. § 7201. I do not believe the Government, which never purported to have audited the returns of the myriad of partnerships, joint ventures and corporations that contributed to the Helmsleys' vast income, proved that Mrs. Helmsley had in fact understated the total taxes due in any of the three years in question. This deficiency in proof of underpayment was exposed by an extremely technical but, I believe, ultimately persuasive argument presented by the defense at trial: certain accelerated depreciation deductions *required* by the law to have been taken by some of their limited partnerships had not in fact been taken, with the result that the Helmsleys' income was overstated by an amount greater than the personal expenses that they falsely claimed as business expenses.

During the years in question, the Helmsleys reported gains or losses from over 100 real estate partnerships. Some of these partnerships owned real estate "placed in service" after December 31, 1980. *See* Economic Recovery Tax Act of 1981, Pub.L. No. 97–34, § 209(a), 95 Stat. 172, 226 (1981). The law is clear that as to such property the Accelerated Cost Recovery System (ACRS) required accelerated depreciation, i.e., it was mandatory, as the majority opinion concedes. *See* 5 *Mertens Law of Fed. Income Tax* § 23.01 (1988 and Supp.1989) ("with limited exceptions, the ACRS provisions are mandatory....").

Yet the Helmsleys' accountants had not taken these deductions. Robert Schweihs, an expert appraiser and cost segregation analyst, testified that as to three of the partnerships (the "Formula partnerships") 7.8 percent of the cost basis was attributable to personal property, required to be deducted by ACRS on a five-year basis as opposed to the 15 or 18 year real property rate on which the Helmsleys actually took all deductions. Gerald Padwe, a recognized tax expert, calculated the additional deductions from the Formula partnerships alone to offset more than the alleged deficiencies in 1983 and 1985 and nearly offset the deficiencies in 1984. But he also testified that the returns had erroneously taken as to real estate only 6.67 percent instead of the required 7 percent deductions, thus making even 1984 an overpayment year. According to this testimony, then the Helmsleys in fact overpaid their taxes by about $93,000 in 1983, $21,000 in 1984, and $477,000 in 1985.

The Government attempts to discredit this testimony with several arguments, two

of which the court partially adopts and adds to, but none of which I find persuasive.[1] In one argument, partially embraced by the court, the jury was entitled to reject Padwe's tax testimony on the basis of the Government's cross-examination because he admitted that he: (a) did not look at all the Helmsley partnership returns; (b) did not look at the effect of ACRS on the income side of Harry Helmsley's 1983 purchase of Leona Helmsley's interest in a partnership; (c) made no attempt to see if his analysis would have applied to the sale of 225 Broadway in 1983 (on which the Helmsleys reported a $23 million gain) so as to cause a greater gain on that sale; and (d) did not check on whether the recapture provisions of section 1245 applied to the Helmsleys' 1983–85 capital gains would have increased their tax liability. I believe, however, that: (a) Padwe only needed to look at returns of partnerships likely to have post-December 31, 1980 property, and he in fact did so as to the post–1975 partnerships, finding them "awash" [sic] (A. 6747) (except for the Formula partnerships); (b) Padwe did *not* agree that the Harry–Leona partnership transfer generated taxable income and, moreover, under 26 U.S.C. § 1041(a)(1) no gain or loss is recognized on an interspousal transfer; (c) 225 Broadway (the Woolworth building) was acquired in 1946 and likely to have little, if any, ACRS property; and (d) Alternative Minimum Tax requirements applied in any event to the Helmsleys. I think the Government's burden of proving a deficiency was not satisfied by the cross-examination of Padwe, nor do I think that the omission to calculate the effect of recapture resulting from the separation of real and personal property for depreciation purposes on the capital gains from the sales of certain other partnerships—"offsets to the offsets"—is of any note. The Government still had to prove a deficiency, and if indeed there were offsets

to the offsets, the Government did not prove them, it merely hypothesized in interrogation.

The court goes on to argue, however, that the Helmsleys had four depreciation options for personal property (5 years in specified percentages as Padwe testified, and 5, 12 and 25 years on a straight-line method). In fact, however, absent a specific election to use one of the three straight-line depreciation methods under 26 U.S.C. § 168(b)(3), ACRS required the specified percentages over 5 years (15, 22, 21, 21 and 21) method to be utilized, as Padwe testified. 26 U.S.C. § 168(b)(1)(A). The Helmsleys clearly made no such election.

The court's response to this is that the Helmsleys "elected" to depreciate personal property over a fifteen year straight-line basis by the way their returns were filed. But this "election" or option was not available to them. They were *required* to follow ACRS. The court's suggestion is that it may have been a "strategically motivated, conscious decision" not to segregate personal property and depreciate it over a permissible period in order to obtain tax benefits, namely, to obtain capital gains treatment for the personal property upon its sale and to avoid recapture as income of depreciated amounts. But there was no evidence as to this; the fact that it could have been so does not make it so. *Fowler v. United States*, 352 F.2d 100, 106 (8th Cir.1965), *cert. denied*, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966), relied on by the majority, stands only for the proposition that one who has elected a legally permissible depreciation method may not defend an evasion charge by showing he could have selected another permissible method. Here, however, the Helmsley claim relates to deductions under a method of depreciation the partnership was legally required to utilize. The court says this makes the case *a fortiori* to *Fowler;* I

---

**1.** The Government's other argument, which I do not read the court's opinion as adopting, was that it would be impossible to prove a tax evasion case with multiple-partnership and corporate returns because by the time the Government audited all the returns the statute would have run on the evasion case. I do not think

the applicable six-year statute, 26 U.S.C. § 6531, is that short. One would hope that tax-shelter real estate entrepreneurs with incomes like the Helmsleys would be regularly and carefully audited from top to bottom instead of waiting for an enterprising newspaper reporter to break his story. "Little people" get audited all the time.

disagree, because that assumes that the failure to segregate personal property and to follow the required ACRS method was conscious, something as to which there is, as I have said, no evidence in the record.

The recapture point I think a bit of a red herring; I agree with the trial judge that it is "human instinct to write off as much as you can as soon as you can."

As a penultimate argument, the court says that the failure to segregate personal property was "equivalent" to selection of an accounting method, which, axiomatically, cannot be changed without the Commissioner's consent, as provided by the statute, 26 U.S.C. § 446(e), and the regulations, Treas.Reg. § 1.167(e)–1(a). However, the change of method requirements were specifically inapplicable to ACRS under the Economic Recovery Tax Act of 1981, Pub.L. No. 97–34, § 203(c)(2), 95 Stat. 172, 222 (1981): "Sections 446 and 481 of the Internal Revenue Code of 1954 shall not apply to the change in the method of depreciation to comply with the provisions of this subsection." Moreover, correction of a classification of property is not a change in method of accounting. Treas.Reg. § 1.446–1(e)(2)(ii)(b).

As the court's final point, the argument is that even if the failure to segregate personal property was a good faith mistake, the sufficiency argument must fail as a matter of law, because Padwe's method of depreciation was only one option among several. Even though the Helmsleys did not elect one of the straight-line methods under ACRS, they could have done so and apparently, the argument runs, could even now do so since good faith taxpayers are often permitted to make a late election under some Tax Court cases and an IRS Tech.Memo. 1986–46010 (July 21, 1986). Moreover, it is said, the adjustment of the depreciation rate made by Padwe from 6.67 percent to 7 percent was "based on a proposed, but never adopted, Treasury Regulation."

To suggest that these bad faith taxpayers could now be entitled to good faith treatment so as to be enabled to take the optional straight-line methods of depreciation then available to them strikes me as disingenuous. In any event, prior to the Tax Reform Act of 1986, such elections were available only to taxpayers who made the election for the year in which the property was placed in service on the return for the taxable year concerned, 5 *Mertens Law of Fed. Income Tax* § 23.57 (1988 and Supp.1989). They were not available, as a matter of law, to the Helmsleys.

The argument that the adjustment of rate from 6.67 to 7 percent was not mandatory because it was based on only a proposed regulation (§ 1.168.2) does not hold water, either. Not only did the Government not challenge this at trial but the ACRS tables were either set forth in the statute itself, Pub.L. No. 97–34, § 201(a), amending 26 U.S.C. § 168(b), 95 Stat. 204 (1981) or, in the case of 15 year real property, were to be "prescribed by the Secretary," Pub.L. No. 97–34, § 201(a), amending 26 U.S.C. § 168(b)(2), 95 Stat. 205 (1981). The 7 percent rate was so "prescribed" in the proposed regulation. I do not see how the Helmsleys could have done other than to follow it. The fact that ACRS was subsequently abolished and the proposed regulation never finalized accordingly seems to me immaterial. Just the other day, our court relied on a proposed but never promulgated regulation in a tax evasion case to substantiate taxpayers' position that they could take certain losses. *United States v. Regan*, 937 F.2d 823, 825 (2d Cir.1991).

For these reasons, I would reverse on the evasion counts.

The appropriateness of such a reversal raises a further question as to whether the infirmities in the Government's case with regard to the evasion counts affected any of the other counts. In my view, though it is arguable, there was probably a spillover to counts thirty through thirty-nine, the mail fraud counts, which related to the filing of false New York State income tax returns reflecting the same deductions as on the federal returns. On balance I would, however, let the conspiracy and false statement counts stand because the

Helmsleys so clearly conspired to and did charge residential and other personal purchases to their corporations and partnerships. Hence, I would uphold the corporation/partnership aiding and abetting counts (14–29) as well.

With regard to sentencing, even if the convictions were altogether affirmed, I would remand for resentencing and would reverse the order of restitution. The amount of tax owed is still a matter of dispute and the prison sentence and order of restitution were directly related to it. Moreover, as I stated, I do not think the Government is a "victim" under the VWPA so as to be entitled to restitution of taxes, interest and penalties. To be sure, the restitution was ordered for violations of Title 18, namely sections 371 (conspiracy) and 1341 (mail fraud). But, as I said, I would reverse as to the mail fraud counts and that would make the restitution order rest only on the conspiracy count, all the overt acts of which related to Title 26, i.e., tax violations, specifically *not* covered by the VWPA. Finally, in relevant part, the VWPA provides:

> Any amount paid to a victim under an order of restitution shall be set off against any amount later recovered *as compensatory damages* by such victim in (A) any Federal civil proceeding.

18 U.S.C. § 3663(e)(2) (1988) (emphasis added).

I suggest that the Government in a civil tax proceeding does not recover "compensatory damages" so that, theoretically at least, the possibility remains that, in addition to the order of restitution, the Government can recover taxes, penalties and interest in a civil proceeding.

Thus, while concurring with affirmance of the convictions on counts one, eight through ten and fourteen through twenty-nine, I respectfully dissent as to the convictions on counts two, three, four and thirty through thirty-nine. I do not think the capping provisions of the Criminal Fine Enforcement Act are applicable, however, and

would let stand the fines of $250,000 on each count affirmed.